IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-02646-PAB-MEH

SHANNON CLARK, individually and on behalf of all others similarly situated,

    Plaintiff,

v.

GREEN TREE SERVICING LLC, a Delaware limited liability company,

    Defendant.

---

### ORDER

---

    This matter is before the Court on Defendant Green Tree's Motion to Dismiss

Class Action Complaint [Docket No. 9].  This case arises out of plaintiff Shannon

Clark's efforts to modify her mortgage loan through her servicer, defendant Green Tree

Servicing LLC ("Green Tree").  The Court's jurisdiction is based on 28 U.S.C.

§ 1332(d)(2).

## I.  BACKGROUND

### A.  Allegations in the Complaint

    The following allegations are set forth in the complaint and will be taken as true

for the purposes of ruling on defendant's motion to dismiss.  *Alvarado v. KOB-TV, LLC*,

493 F.3d 1210, 1215 (10th Cir. 2007).  Green Tree services residential mortgage loans.

Docket No. 1 at 1, ¶ 2.  Over the past several years, Green Tree has purchased billions

of dollars of servicing rights to loans owned by Bank of America, N.A. ("BAC").  *Id*. at 2,

¶ 3.  In its role as a servicer, Green Tree signed a contract in April 2009 with the United

States Department of the Treasury to participate in the Home Affordable Modification Program ("HAMP"), a federal program intended to help homeowners remain in their homes despite financial difficulties. *Id*. at 2, ¶ 4.  Green Tree has failed to satisfy its obligations under HAMP, as well as under federal and state law, by (1) providing borrowers with deficient validation notices; (2) claiming to have lost or never received financial documentation submitted by borrowers; and (3) refusing to abide by the terms of permanent modification agreements. *Id*. at 2-3, ¶¶ 5-6.  Green Tree engages in these practices in order to maximize its own profits. *Id*. at 3, ¶ 7.

On February 18, 2009, acting on their authority under the Emergency Economic Stabilization Act of 2008 and the American Recovery and Reinvestment Act of 2009, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency introduced HAMP, designed to encourage loan servicers to modify loans.  Docket No. 1 at 6-8, ¶¶ 18-20.  Under HAMP, servicers receive $1,000 for each loan they modify. *Id*. at 7-8, ¶ 20.

A HAMP modification proceeds in two stages: first, a servicer gathers a borrower's financial information to determine whether the borrower qualifies and, if so, offers the borrower a trial period plan ("TPP").  Docket No. 1 at 9, ¶ 25.  If the borrower makes all the payments under the TPP and otherwise satisfies the eligibility requirements, the servicer offers the borrower a permanent modification agreement ("PMA"). *Id*.  Once the PMA is signed by both parties and notarized, the loan is permanently modified. *Id*. at 10, ¶ 27.  Green Tree systematically refuses to honor TPPs that borrowers obtained from BAC before the right to service their loans was

2

transferred to Green Tree. *Id*. at 9, ¶ 26.  Green Tree systematically fails to honor

PMAs that have been signed and recorded by unilaterally revoking agreements,

reverting to borrowers' original loan terms, and coercing borrowers into signing new and

less favorable PMAs by threatening them with foreclosure. *Id*. at 10, ¶ 27.  Green Tree

refuses to correct known errors in this process, fails to adequately hire and train its

staff, routinely loses borrowers' documents, routinely ignores documents submitted by

borrowers, and routinely disregards HAMP guidelines and directives. *Id*. at 10, ¶ 28.

Because banks such as BAC have decreasing incentives to retain the servicing

rights to underperforming loans–which are classified as "riskier" assets that require

them to hold more equity and which must be written down as default rates rise and

interest rates drop–they often sell the rights to entities like Green Tree that lack the

resources, ability, and incentive to service loans in compliance with applicable law.

Docket No. 1 at 4-6, ¶¶ 12-17.

Plaintiff Shannon Clark is a Colorado homeowner.  Docket No. 1 at 10, ¶ 29.  In

early 2012, she began having difficulty making her mortgage payments.  She applied

for a loan modification through HAMP on July 31, 2012. *Id*.  On August 28, 2012, BAC

sent a letter to plaintiff indicating that her loan would be serviced by Green Tree as of

September 16, 2012. *Id*. at 11, ¶ 30.  The notice stated that BAC would transfer

documentation related to any loan modifications to Green Tree. *Id*. at 11, ¶ 32.

On September 14, 2012, BAC sent Ms. Clark a TPP (the "first TPP") pursuant to

HAMP.  Docket No. 1 at 12, ¶ 34.  Under the first TPP, Ms. Clark was required to make

three monthly payments of $1,173.05. *Id*. at 14, ¶ 44.  On September 27, 2012, Green

Tree notified Ms. Clark of her designated account representative. *Id*. at 12, ¶ 37.  On October 1, 2012, Green Tree sent her a notice reporting the total amount due on her loan. *Id*. at 12-13, ¶ 38.

On October 15, 2012, Ms. Clark called Green Tree and spoke with a customer service representative who stated that Green Tree had no record of Ms. Clark's first TPP or her attempts to modify her loan.  Docket No. 1 at 13, ¶ 39.  Ms. Clark promptly faxed a copy of her first TPP and supporting documentation to Green Tree; when she called later to confirm receipt, Green Tree denied ever receiving the documents. *Id*. at 13, ¶ 40.  Ms. Clark then spoke with a Green Tree representative who said that a new phone application was necessary to determine whether Ms. Clark was eligible to apply for a HAMP modification. *Id*. at 13, ¶ 41.

On November 6, 2012, Ms. Clark received a HAMP application package from Green Tree, which stated that the application was due the same day.  Docket No. 1 at 13, ¶ 42.  Ms. Clark completed the application and sent it back, along with the first trial payment due under the first TPP, which Green Tree deposited in December 2012. *Id*.  On December 10, 2012, Green Tree informed Ms. Clark that she had been approved for a HAMP trial plan and sent her a new TPP (the "second TPP"). *Id*. at 14, ¶ 43.  Although Ms. Clark's financial circumstances had not changed since she received the first TPP, the second TPP required her to make three monthly payments of $1,381.76. *Id*. at 14, ¶ 44.  Ms. Clark made the three trial payments due under the second TPP on January 1, February 1, and March 1, 2013. *Id*. at 13, ¶ 45.  During that time, Ms. Clark

continued to receive letters from Green Tree regarding foreclosure and the sale date of her home.  *Id*.

On March 20, 2013, Green Tree sent Ms. Clark a PMA (the "first PMA").  Docket No. 1 at 14, ¶ 46.  An attached letter instructed Ms. Clark that, "[t]o accept this offer, you must sign and return both copies of the Modification Agreement to us in the enclosed, pre-paid envelope by 04/19/2013."  *Id*. (emphasis in original).  On April 10, 2013, Ms. Clark signed two copies of the first PMA before a notary public and sent the copies to Green Tree.  *Id*. at 14, ¶ 47.  On April 22, 2013, Jeff D. Koenig, Green Tree's Director of Default Services, signed the first PMA before a notary public.  *Id*.  On May 6, 2013, the first PMA was recorded in Jefferson County, Colorado.  *Id*.

On July 19, 2013, Green Tree sent Ms. Clark a second PMA (the "second PMA"), which differed from the first.  Docket No. 1 at 15, ¶ 50.  Specifically, the second PMA had a higher principal balance, a longer term, a higher interest rate, and slightly lower monthly payments.  *Id*. at 15, ¶ 51.  The second PMA did not forgive any of Ms. Clark's principal and it provided for finance charges that were three and one-half times as high over the life of the loan.  *Id*. at 16, ¶ 51.

Ignoring both PMAs, Green Tree sent Ms. Clark notices of default, foreclosure, loss mitigation alternatives, and her right to cure on May 28, June 5, June 17, June 19, and July 17 of 2013.  *Id*. at 16, ¶ 52.

On July 26, 2013, Ms. Clark spoke with a Green Tree representative who told her that she did not qualify for the terms set forth in the first PMA and that the documents were sent to her in error.  *Id*. at 16-17, ¶ 53.  Based on the HAMP rules and

plaintiff's financial documentation, Green Tree's representation that she did not qualify for the terms set forth in the first PMA was incorrect.  *Id*. at 17-19, ¶¶ 55-57.  On July 31, 2013, Ms. Clark spoke with another Green Tree representative about her eligibility for HAMP and the representative told her he would "personally cancel" her application and place her house in foreclosure if she did not sign the second PMA.  *Id*. at 17, ¶ 55.

In July 2013, Ms. Clark obtained a personal credit report, which indicated that Green Tree had reported her loan as past due prior to April 2013.  Docket No. 1 at 20, ¶ 62.  Green Tree reported her loan as being current in April 2013 and as being over $13,000 past due in May, June, July, and August, 2013; by September 2013, Green Tree was reporting Ms. Clark as being $17,722.87 past due.  *Id*. 20-21, ¶¶ 62-63.  Green Tree's May 6, 2013 monthly billing statement listed a monthly payment of $1,102.90.  *Id*. at 20, ¶ 63.  Statements for June, July, August, and September 2013 listed a monthly payment of $1,265.87–Ms. Clark's original loan payment.  *Id*. at 20-21, ¶ 63.

On August 7, 2013, Green Tree sent Ms. Clark an additional copy of the second PMA.  Docket No. 1 at 19, ¶ 58.  During the course of several conversations with Green Tree representatives regarding the second PMA, Ms. Clark was told that "Green Tree had made 'mistakes' on its end by sending out the wrong PMAs and that it had happened to 'lots' of other people."  *Id*. at 19, ¶ 59.

On September 20, 2013, Green Tree responded to a Qualified Written Request sent by Ms. Clark with a letter stating:

> As you are aware, an error was detected on the modification agreement sent on March 20, 2013.  A revised modification agreement was provided to you

> on July 19, 2013 to correct the terms and conditions of the plan.   The
> previous agreement executed by Borrower and Lender are [sic] void and of
> no legal effect.  If you elect not to sign the corrected agreement, the terms
> of your original loan documents shall continue and you will not be eligible for
> a modification under the HAMP.

Docket No. 1 at 19-20, ¶ 60.  Green Tree was incorrect in stating that the first PMA was

subject to error and thus had no basis for refusing to honor it.  *Id*. at 20, ¶ 61.

## B.  Procedural Background

Ms. Clark brought this case on September 27, 2013, alleging (1) violations of the

Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*.; (2) fraudulent

misrepresentation; (3) breach of the first TPP; (4) unjust enrichment; (5) breach of the

first PMA; (6) breach of the implied covenant of good faith and fair dealing;

(7) promissory estoppel; (8) violation of the Equal Credit Opportunity Act ("ECOA"), 15

U.S.C. § 1691; (9) violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C.

§ 1681s-3; and (10) violations of the Colorado Consumer Protection Act ("CCPA"),

Colo. Rev. Stat. § 6-1-101.  Docket No. 1.  Ms. Clark is seeking to represent a class of

all others similarly situated.  *Id*. at 1.  On November 13, 2013, Green Tree moved to

dismiss the complaint.  Docket No. 9.  Ms. Clark opposes dismissal.  Docket No. 12.

## II.  STANDARD OF REVIEW

The Rule 12(b)(6) standard tests "the sufficiency of the allegations within the four

corners of the complaint after taking those allegations as true."  *Mobley v. McCormick*,

40 F.3d 337, 340 (10th Cir. 1994).  To survive a Rule 12(b)(6) motion, "[t]he complaint

must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery

will reveal evidence to support the plaintiff's allegations."  *Shero v. City of Grove, Okla*.,

510 F.3d 1196, 1200 (10th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[P]lausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiff[ ] [has] not nudged [her] claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotations and citations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  However, "[a] pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'  Nor does the complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (citation omitted).  That said, "[s]pecific facts are not necessary[. Instead,] the statement need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests[, and is not required to] include all facts necessary to carry the plaintiff's burden." *Khalik*, 671 F.3d at 1192 (internal citation and quotation omitted).

## III.  ANALYSIS

### A.  Federal Claims

#### 1.  *Equal Credit Opportunity Act*

Plaintiff alleges that defendant violated ECOA by failing to provide a written statement of reasons in advance of placing her loan in default, reporting her as past due to credit bureaus, revoking the first PMA, and threatening her with foreclosure.

Docket No. 1 at 55, ¶¶ 191-93.  Defendant argues that plaintiff fails to state a claim

under ECOA because plaintiff was in default at the time defendant took adverse action

against her and because defendant is not a "creditor" within the meaning of the statute.

Docket No. 9 at 3-4.

Under ECOA, "[e]ach applicant against whom adverse action is taken shall be

entitled to a statement of reasons for such action from the creditor."  15 U.S.C.

§ 1691(d)(2).  "Adverse action" means a "denial or revocation of credit, a change in the

terms of an existing credit arrangement, or a refusal to grant credit in substantially the

amount or on substantially the terms requested."  *Id*. at § 1691(d)(6).  It does not

include a "refusal to extend additional credit under an existing credit arrangement where

the applicant is delinquent or otherwise in default, or where such additional credit would

exceed a previously established credit limit."  *Id*.  Whether an applicant is "in default" is

determined with respect to the time the purportedly adverse action was taken.  *See*

*Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389, 406-07 (6th Cir. 1998); *see also*

*Davis v. Citimortgage, Inc.*, 2011 WL 891209, at *2 (E.D. Mich. Mar. 11, 2011).

"Credit" is the "right granted by a creditor to an applicant to defer payment of a

debt, incur debt and defer its payment, or purchase property or services and defer

payment therefor."  12 C.F.R. § 202.2(j).  A "creditor" is "any person who regularly

arranges for the extension, renewal, or continuation of credit."  15 U.S.C. § 1691a(e);

*see also* 12 C.F.R. § 202.2(l) ("Creditor means a person who, in the ordinary course of

business, regularly participates in a credit decision, including setting the terms of the

credit.").  A creditor "revokes credit when it annuls, repeals, rescinds or cancels a right

to defer payment of a debt." *Schlegel v. Wells Fargo Bank, NA*, 720 F.3d 1204, 1211 (9th Cir. 2013).  Sending default notices  and accelerating a loan despite a homeowner's compliance with an approved loan modification may constitute adverse action. *Id*. at 1210-11.

With respect to Green Tree's status as a creditor, plaintiff alleges that, in its capacity as a HAMP servicer, Green Tree must "evaluate *all loans* that are delinquent sixty (60) days or greater for HAMP modifications" and, if contacted by a borrower requesting a modification, must "collect income and hardship information to determine if the HAMP is appropriate for the borrower."  Docket No. 1 at 8-9, ¶ 24 (emphasis in original).  She further alleges that Green Tree determined her eligibility for a TPP and a PMA, that it unilaterally revoked the first PMA, and that it set the terms of the second PMA. *Id*. at 13-17, ¶¶ 39-55.

Plaintiff sufficiently alleges that Green Tree "regularly participates in a credit decision, including setting the terms of the credit," *see* 12 C.F.R. § 202.2(l), insofar as it regularly evaluates borrowers for loan modifications and sets the terms of the modifications it offers.[1]

───────────────

[1]Green Tree cites language in  *Wenglicki v. Tribeca Lending Corp.*, 2009 WL 2195221, at *5 (E.D. Pa. July 22, 2009), that "[defendant] is a servicer, not creditor (at least as alleged by [plaintiff]) therefore there can be no ECOA claim."  Docket No. 9 at 5. *Wenglicki* does not discuss whether the defendant servicer determined eligibility for or issued loan modifications.  Moreover, it does not appear that the plaintiff alleged that he applied for a modification through the defendant servicer. *See id*. at *1-2. Accordingly, the Court does not find *Wenglicki* persuasive with respect to plaintiff's ECOA claim in this case.  Defendant also cites cases interpreting the meaning of "creditor" under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*.  Docket No. 17 at 3 n.1.  These cases are inapposite because the definition of a "creditor" under TILA is different from the definition under ECOA. *See* 15 U.S.C. § 1602(g) ("The term 'creditor' refers only to a person who both (1) regularly extends, whether in connection

With respect to whether plaintiff was in default at the time of the alleged ECOA violation, plaintiff alleges that she was in compliance with the terms of the first PMA–which had been signed by both parties and recorded–at the time defendant took adverse action against her by revoking the first PMA, instructing her to sign a second PMA with less favorable terms, and threatening her with foreclosure.  Docket No. 1 at 14-17, ¶¶ 47, 50-53.

Defendant argues that plaintiff herself alleges that she was behind in her mortgage payments and that the "mere fact that Plaintiff timely made reduced trial payments does not render the underlying loan current."  Docket No. 17 at 2.  Defendant cites cases holding that borrowers who make timely payments pursuant to a TPP and are then denied a permanent modification cannot state an ECOA claim because the borrowers were in default at the time the permanent modification was denied.  Docket No. 9 at 3 (citing *Guthrie v. Bank of America, Nat'l Ass'n*, 2012 WL 6552763, at *6 (D. Minn. Dec. 14, 2012) ("Plaintiffs do not dispute that they had defaulted on their mortgage by the time of their loan modification request.  As a result, Bank of America's denial of this request did not amount to an 'adverse action,' and it did not trigger ECOA notice requirements."); *Pandit v. Saxon Mortg. Servs., Inc.*, 2012 WL 4174888, at *7 (E.D.N.Y. Sept. 17, 2012) ("a denial of a HAMP loan modification does not trigger the ECOA's adverse action explanation requirement because the TPP did not alter the

_____

with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.").

11

terms of Plaintiffs' underlying loan obligations"); and *Eichholz v. Wells Fargo Bank, NA*, 2011 WL 5375375, at *9 (E.D. Mich. Nov. 7, 2011) ("The HAMP trial program did not modify Plaintiff's underlying mortgage obligations and Plaintiff was already in default on April 29, 2010, when Defendant notified Plaintiff of the modification decision.")).

This case is distinguishable from *Guthrie*, *Pandit*, and *Eichholz* because, here, plaintiff alleges that her loan had been permanently modified by the first PMA, which was signed by both parties and recorded in Jefferson County.  Docket No. 1 at 55, ¶ 191.  Instead, this case is similar to *Schlegel*, which held that the plaintiffs stated an ECOA claim where they alleged that the defendant bank had sent multiple default notices, accelerated their loan, and threatened imminent foreclosure proceedings despite the fact that the plaintiffs were current on their payments under a modified loan. 720 F.3d at 1206-07, 1211 ("the facts alleged plausibly give rise to the claim that Wells Fargo terminated the loan modification agreement and thereby revoked the Schlegels' credit for purposes of § 1691(d)(6)").  Like the plaintiffs in *Schlegel*, Ms. Clark is challenging the alleged revocation of an executed modification agreement, not the denial of a permanent modification following a TPP, as in *Guthrie*, *Pandit*, and *Eichholz*.

Thus, plaintiff's allegation that defendant took adverse action by revoking the first PMA and requiring her to agree to a PMA with less favorable terms states a claim under ECOA.

### 2.  Fair Credit Reporting Act

Plaintiff alleges that defendant violated FCRA, 15 U.S.C. § 1681s-2(a), by failing to provide a timely response to her written dispute regarding defendant's reporting to

the credit bureaus and in incorrectly reporting her loan as past due.  Docket No. 1 at 58,

¶¶ 205-06. Defendant argues that this claim fails because there is no private right of

action to enforce the provision of FCRA under which plaintiff sues.  Docket No. 9 at 4.

Defendant is correct that there is no private right of action under § 1681s-2(a) of

FCRA against entities that provide information to the credit reporting agencies.

*Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1147 (10th Cir. 2012)

("The FCRA imposes a duty on persons who provide information to credit reporting

agencies ('furnishers') to accurately report information.  15 U.S.C. § 1681s-2(a).  While

[this provision] also gives consumers a private right of action against those who violate

its provisions, *see* 15 U.S.C. § 1681n (right of action against willful violators), and 15

U.S.C. § 1681o (right of action against negligent violators), that right of action is limited

to claims against the credit reporting agency; it does not extend to furnishers.  15

U.S.C. § 1681s-2(c).")

In her response to the motion to dismiss, plaintiff moves for leave to amend her

complaint to state a claim under 15 U.S.C. § 1681s-2(b), which provides that:

> After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute
> with regard to the completeness or accuracy of any information provided by
> a person to a consumer reporting agency, the person shall–
>
> (A) conduct an investigation with respect to the disputed information;
>
> (B) review all relevant information provided by the consumer reporting
> agency pursuant to section 1681i(a)(2) of this title;
>
> (C) report the results of the investigation to the consumer reporting agency[.]

15 U.S.C. § 1681s-2(b)(1)

Although there is a private right of action to enforce this provision against furnishers, the duty to investigate a dispute only arises after a credit reporting agency notifies the furnisher of the dispute.  *Sanders*, 689 F.3d at 1147 ("When the furnisher receives notice of a dispute from the credit reporting agency, it must perform the verification and correction duties described in 15 U.S.C. § 1681s-2(b)."); 15 U.S.C. § 1681s-2(b) ("After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency . . . ."); 15 U.S.C. § 1681i(a)(2)(A) ("Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any consumer . . ., the agency shall provide notification of the dispute to any person who provided any item of information in dispute[.]").

Plaintiff seeks leave to assert a claim that defendant violated § 1681s-2(b) based on the allegation that plaintiff "'submitted a formal dispute to the credit bureaus' regarding Green Tree's incorrect reporting of her mortgage loan and that, to-date, Green Tree is yet to correct its furnishing of inaccurate information to the credit bureaus."  Docket No. 12 at 5.  Granting leave to amend would be futile because plaintiff does not allege that defendant was notified of the dispute by a credit reporting agency.  *See id.*; *see also* Docket No. 1 at 58, ¶ 204 ("Clark explained [to Green Tree] that she had submitted a formal dispute to the credit bureaus and requested a response from Green Tree as to why her account was being reported incorrectly.  Clark attached to her letter a copy of her credit bureau report, along with documents evidencing the recorded permanent modification agreement.")); *Pinson v. Equifax Credit*

*Info. Servs., Inc.*, 316 F. App'x 744, 751 (10th Cir. 2009) ("because the amended complaint alleges only that the Pinsons–not any [consumer reporting agency]–notified Capital One that its information was in dispute, the Pinsons failed to state a claim against Capital One under the FCRA").

It would be futile for plaintiff to amend her complaint to assert a claim under 15 U.S.C. § 1681s-2(b).  As a result, the Court will deny leave to amend.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993) ("Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment.").

### 3.  Fair Debt Collection Practices Act

Plaintiff alleges that defendant violated the FDCPA by sending her a noncompliant validation notice and by making false or misleading representations regarding the status of her debt.  Docket No. 1 at 27-28, ¶¶ 85-87.  Defendant argues that plaintiff fails to state a claim under the FDCPA because the letter it sent to plaintiff on September 27, 2012 did not trigger the obligation to send a proper validation notice and because Green Tree is the "second debt collector" on plaintiff's loan and thus not subject to the requirements of 15 U.S.C. § 1692g.  Docket No. 9 at 6-7.

The FDCPA provides that:

Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing–

(1) the amount of the debt;

15

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g.  A "debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6).  The term does not include someone attempting to collect a debt that was not in default at the time it was obtained by such person.  *Id*. at § 1692a(6)(F).

A "communication" is connected to the collection of a debt if it conveys "information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2).  Courts consider several factors in determining whether a letter is a communication connected to the collection of a debt: (1) whether the letter explicitly demands payment; (2) the nature of the parties' relationship; and (3) the purpose and context of the letter.  *Gburek v. Litton Loan Serv. LP*, 614 F.3d 380, 386 (7th Cir. 2010). A letter that informs a homeowner that her loan has been transferred to a new servicer, but does not request payment, set forth the amount due, or set a deadline for payment

is not a communication in connection with the collection of a debt.  *See Cigler v. Ocwen Loan Serv., LLC*, 2014 WL 1908435, at *3 (N.D. Ind. May 9, 2014).

The FDCPA also prohibits using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.

Plaintiff alleges that the September 27, 2012 letter was an initial communication in connection with the collection of a debt and that the October 1, 2012 letter was a validation notice that did not meet the requirements of § 1692g.  Docket No. 1 at 25-28, ¶¶ 76-86.

The September 27, 2012 letter does not make a request for payment, set forth the amount due, or set a deadline for payment.  Docket No. 1-4 at 13.  The letter does not indicate that plaintiff's loan is in default or contain any other information about her loan.  *See id*.  Plaintiff does not allege that the letter was sent in conjunction with other documents indicating that the purpose of the letter was to collect a debt.  *See Gburek*, 614 F.3d at 385 ("We emphasized in *Ruth* [*v. Triumph Partnerships*, 577 F.3d 790, 798-99 (7th Cir. 2009)] that the privacy notice was sent in the same envelope as a collection letter, and when packaged together in this way constitute a communication 'sent in connection with an attempt to collect a debt.'").  Although the September 27, 2012 letter contained a disclosure that tracks the language in 15 U.S.C. § 1692e(11) (requiring debt collectors to "disclose in the initial written communication with the consumer . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose"); *see* Docket No. 1-4 at 13, this disclaimer on its own is

17

not sufficient to trigger the protections of the FDCPA. *See Lewis*, 135 F.3d at 399 ("We note that the mere fact that the letter states at the bottom that it 'is an attempt to collect a debt' does not transform the letter into an unlawful demand for payment."); *see also Gburek*, 614 F.3d at 386 n.3.

In sum, the three factors identified in *Gburek* weigh against finding that the September 27, 2012 letter was an initial communication in connection with the collection of a debt. *See* 614 F.3d 380, 386. Thus, the October 1, 2012 letter was not subject to the requirements of § 1692g and cannot support plaintiff's FDCPA claim.

The Court's inquiry does not end there, however, because plaintiff additionally alleges that defendant violated the FDCPA by "misrepresenting the status of the debt as accelerated and the total outstanding balance as due and owing." Docket No. 1 at 28, ¶ 87. Defendant has not moved to dismiss plaintiff's claim on this basis. Docket No. 9 at 5-7; Docket No. 17 at 4-5. Instead, defendant argues that plaintiff does not sufficiently allege that defendant obtained the loan when it was already in default and thus that defendant does not qualify as a debt collector under the FDCPA. Docket No. 17 at 5 n.2.

The complaint attaches a copy of plaintiff's purported credit report.[2] Docket No. 1-3 at 42-43. The report indicates that plaintiff's loan payments were 150 days past due as of September 2012. *Id*. at 43. Plaintiff alleges that Green Tree acquired the servicing rights to her loan on September 16, 2012. Docket No. 1 at 11, ¶ 30. As a

---

[2]The Court may consider documents that are attached to and referred to in the complaint without converting a motion to dismiss into a motion for summary judgment. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

result, the Court finds that plaintiff has sufficiently alleged that defendant acquired her loan when it was in default and thus qualifies as a debt collector within the meaning of the FDCPA.

Accordingly, plaintiff's claim for violation of 15 U.S.C. § 1692e survives.

### B.  State Law Claims

Plaintiff asserts five state law claims: breach of contract, fraudulent misrepresentation, unjust enrichment, promissory estoppel, and violation of the CCPA. Defendant argues that plaintiff's state law claims should be dismissed as "an impermissible end run around HAMP" because it does not contain a private right of action.  Docket No. 9 at 1.

As the court explained in *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 581 (7th Cir. 2012), defendant's "end-run theory is built on the novel assumption that where Congress does not create a private right of action for violation of a federal law, no right of action may exist under state law, either."  The court characterized this argument as a conflation of the law concerning federal private rights of action and the law concerning federal preemption.  *Id*.  The court stated that the "absence of a private right of action from a federal statute provides no reason to dismiss a claim under a state law just because it refers to or incorporates some element of the federal law."  *Id*.  The court went on to cite notable cases in which the Supreme Court had found there was federal subject matter jurisdiction over state law claims that incorporated elements of federal law without suggesting that the federal laws in question would preempt the state law claims.  *See id*. at 581-82 (citing *Grable & Sons Metal Prods., Inc. v. Darue Engineering*

& *Mfg.*, 545 U.S. 308, 312 (2005); *Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 805-07 (1986); and *Moore v. Chesapeake & Ohio Ry.*, 291 U.S. 205, 214-15 (1934)).  The court also considered and rejected the defendant's argument that HAMP preempted the plaintiff's state law claims via either field preemption or conflict preemption.  *See id*. at 576-80.

With one exception,[3] the cases defendant cites were decided before *Wigod*. *See* Docket No. 9 at 8-9.  These cases do not hold that HAMP preempts state law, but instead recite the theory that, in order to be viable, a state law breach of contract claim must be independent of the HAMP guidelines or program materials.  *See, e.g.*, *Senter v. JPMorgan Chase Bank, N.A.*, 810 F. Supp. 2d 1339, 1358 (S.D. Fla. 2011) ("The Court does not find the Plaintiffs' distinction between enforcing a bank's obligations under the HAMP and a bank's contractual agreement with a private consumer that arises from the bank's participation in the HAMP convincing.").

As the court explained in *Wigod*, however, a contract does not become unenforceable under state law simply because it incorporates elements of a federal law that does not contain a private right of action.  673 F.3d at 582 ("[There is no] general rule that where a state common law theory provides for liability for conduct that is also violative of federal law, a suit under the state common law is prohibited so long as the federal law does not provide for a private right of action.  Indeed, it seems the only justification for such a rule would be federal preemption of state law.") (citation omitted).

---

[3]Defendant cites *Miller v. Chase Home Finance, LLC*, 677 F.3d 1113 (11th Cir. 2012), which was decided after *Wigod*.  *Miller* is inapposite because the appellant in that case had waived the argument that his breach of contract claim was independent from the defendant's obligations under HAMP.  677 F.3d at 1117.

Absent an indication that Congress intended HAMP to preempt all related state law claims, such claims survive.  *See Wyeth v. Levine*, 555 U.S. 555, 564-65 (2009) ("[i]n all pre-emption cases, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (internal citation and quotation marks omitted); *see also Vida v. OneWest Bank, F.S.B.*, 2010 WL 5148473, at *5 (D. Or. Dec. 13, 2010) ("[T]he court does not agree with Defendants' premise that they are wholly immunized for their conduct so long as the subject transaction is associated with HAMP.").

Because the Court agrees with the reasoning of *Wigod* as to defendant's end run theory, the Court will consider the merits of plaintiff's state law claims.

### 1.  Statute of Frauds

Defendant argues that plaintiff's state law claims related to the first TPP are barred by the Statute of Frauds.  Docket No. 9 at 9-11.

The Colorado Statute of Frauds was enacted in 1989 "in an effort to discourage lender liability litigation and to promote certainty into credit agreements involving a principal amount of more than $25,000 in which the creditor is a financial institution." *Norwest Bank Lakewood, Nat'l Ass'n v. GCC P'ship*, 886 P.2d 299, 301 (Colo. App. 1994).  Under the Statute, "no debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought."  Colo. Rev. Stat. § 38-10-124(2).

The Statute "precludes exceptions by implication 'under any circumstances, including, without limitation, from the relationship, fiduciary or otherwise, of the creditor and the debtor or from performance or partial performance by or on behalf of the creditor or debtor, or by promissory estoppel.'" *Norwest Bank Lakewood*, 886 P.2d at 302 (quoting Colo. Rev. Stat. § 38-10-124(3)); *see also Univex Int'l, Inc. v. Orix Credit Alliance, Inc.*, 902 P.2d 877, 880 (Colo. App. 1995) ("Section § 38-10-124(3) specifically precludes assertion of a promissory estoppel claim to enforce an unsigned credit agreement despite case law relating to other types of oral agreements or promises."); *Lang v. Bank of Durango*, 78 P.3d 1121, 1123 (Colo. App. 2003) (dismissing unjust enrichment claim based on unsigned credit agreement as barred by statute of frauds); *Ivar v. Elk River Partners, LLC*, 705 F. Supp. 2d 1220, 1228-30 (D. Colo. 2010) (dismissing plaintiff's CCPA claim as barred by the statute of frauds).

"[I]t is now well established that § 38-10-124 is not limited by its terms to contract claims or to those tort claims which seek the enforcement of a credit agreement." *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 515 (Colo. App. 2006) (internal citation omitted) (dismissing fraudulent inducement claim under the Statute of Frauds). The Statute also applies to "claims which merely relate to credit agreements." *Schoen v. Morris*, 15 P.3d 1094, 1097 (Colo. 2000) (internal citation omitted).

The term "credit agreement" refers to a "contract, promise, undertaking, offer, or commitment to lend, borrow, repay, or forbear repayment of money, to otherwise extend or receive credit, or to make any other financial accommodation," as well as any "amendment of, cancellation of, waiver of, or substitution for any or all of the terms or

provisions of any of the credit agreements defined" above and any "representations and warranties made or omissions in connection with the negotiation, execution, administration, or performance of, or collection of sums due under, any of the credit agreements defined" above.  Colo. Rev. Stat. § 38-10-124(1)(a).

The Colorado Uniform Electronic Transactions Act ("UETA") states that an "electronic signature satisfies the law" where a signature is required and thus that a "contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation."  Colo. Rev. Stat. § 24-71.3-107(2), (4).  The UETA does not apply to a notice of "[d]efault, acceleration, repossession, foreclosure, or eviction, or the right to cure, under a credit agreement secured by . . . a primary residence of an individual."  *Id*. at § 24-71.3-103(3)(b)(II).

In this case, the first TPP states in pertinent part:

> We are pleased to tell you that **you are approved to enter into a Trial Period Plan under the federal government's Home Affordable Modification Program**.  This is the next step toward qualifying for affordable mortgage payments.  Please read this letter so that you understand all the steps you need to take to permanently modify your mortgage, starting with your first Trial Period Plan payment.
>
> **What you need to do**
> To accept this offer, you must make new monthly Trial Period Plan payments in the exact amount shown below in place of your normal monthly mortgage payment.  Each payment must be made in the exact amount of your Trial Period Plan payment and in a timely manner. . . .
>
> If you successfully make all of your Trial Period Plan payments, and return any additional documents that may be required, you may receive a Modification Agreement explaining your loan modification terms that must be signed, notarized and returned to us.  At that time, your modification will be officially permanent.

Docket No. 1-2 at 2 (emphasis in original). There is a typed signature block at the bottom of the first page that reads:

> CHRISTINA SHERMAN
> Home Loan Team
> Bank of America, N.A.

*Id*.

Plaintiff argues that the first TPP is not subject to the Statute of Frauds because it does not contain a promise on defendant's part to "lend money or amend an existing credit agreement." Docket No. 12 at 10. Since the execution of a modification agreement is "an intervening precondition to receiving any permanent modification," according to plaintiff's argument, it is the modification that qualifies as a credit agreement, not the TPP. *Id*.

The Statute of Frauds applies to a promise to "forbear repayment of money,"[4] as well as a promise "to make any other financial accommodation." Colo. Rev. Stat. § 38-10-124(1)(a)(I). In the first TPP, defendant offered to forbear repayment of money, insofar as it invited plaintiff to make lower monthly mortgage payments without risking foreclosure.[5] *See* Docket No. 1-2 at 2, 4 ("If you make your new payments on time each month, we will not conduct a foreclosure sale."). Accordingly, the first TPP falls within the reach of the Statute of Frauds.

---

[4]"Forbearance" is the "act of refraining from enforcing a right, obligation, or debt." Black's Law Dictionary (9th ed. 2009), forbearance.

[5]Although defendant's alleged continuing efforts to foreclose on plaintiff's home, *see* Docket No. 1 at 16, ¶ 52, appear to contravene the terms of the TPP, they do not alter the document's apparent meaning or its status as a promise to forbear the repayment of money.

Plaintiff further argues that the first TPP was electronically signed by Christina Sherman.  Docket No. 12 at 9.  Plaintiff does not address the provision that excludes from the UETA's scope a notice of "the right to cure, under a credit agreement secured by . . . a primary residence of an individual."  Colo. Rev. Stat. § 24-71.3-103(3)(b)(II).  The TPP notified plaintiff that, if she complied with its provisions, she would be eligible for a permanent modification of her loan, which could cure her default.  *See* Docket No. 1-2 at 5 ("Your loan may be brought current by capitalizing past due amounts.").  Since the first TPP provided notice of the right to cure a default under a credit agreement secured by plaintiff's primary residence, it is excluded from the UETA and Ms. Sherman's electronic signature is insufficient to satisfy the requirements of the Statute of Frauds.

Accordingly, plaintiff's breach of contract claims are barred insofar as they are based on the first TPP.  Furthermore, plaintiff's claims for fraudulent misrepresentation, unjust enrichment, promissory estoppel, and violation of the CCPA are also barred insofar as they are based on the first TPP.  *See Premier Farm Credit*, 155 P.3d at 515; *Schoen*, 15 P.3d at 1097.

### 2. Breach of the First Permanent Modification Agreement

Plaintiff alleges that defendant breached the first PMA by "failing to permanently modify Clark's and the other Class Members' loans and by instead sending them new PMAs for their signature and threatening them with foreclosure or wrongfully dispossessing them of their homes if they refused to sign the new, less favorable PMA."  Docket No. 1 at 38, ¶ 129; *see also id*. at 42-43, ¶ 139.  Defendant argues that this

contract claim fails because plaintiff has not alleged valid consideration.  Docket No. 9

at 14 ("Plaintiff has merely promised to do–repay the amount of the debt–what she was

already obligated to perform under the Loan documents.").

"[A]ny benefit to a promisor or any detriment to a promisee at the time of the

contract–no matter how slight–constitutes adequate consideration."  *Lucht's Concrete*

*Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011).  In *Wigod*, the court found

that there was sufficient consideration supporting a TPP through which the borrower

"incurred cognizable legal detriments" by promising to "open new escrow accounts,"

"undergo credit counseling (if asked)," and "provid[ing] and vouch[ing] for the truth of

her financial information."  673 F.3d at 564.

As in *Wigod*, the first PMA here required plaintiff to open new escrow accounts,

undergo credit counseling if asked to do so, and provide and vouch for the truth of her

financial information.  *See* 673 F.3d at 564; Docket No. 1-3 at 4, 6 ¶¶ 1(D), (F) and

3(D).  In addition, the first PMA provided that

> The modified principal balance of my Note will include all amounts and
> arrearages that will be past due as of the Modification Effective Date . . . I
> understand that by agreeing to add the Unpaid Amounts to the outstanding
> principal balance, the added Unpaid Amounts accrue interest based on the
> interest rate in effect under this Agreement.  I also understand that this
> means interest will now accrue on the unpaid interest that is added to the
> outstanding principal balance, which would not happen without this
> Agreement.

Docket No. 1-3 at 5.  Since the first PMA required plaintiff to pay interest on the interest

she had already accrued–which she would not have been required to pay under the

terms of her original loan–the first PMA was supported by valid consideration.  *See*

*Lucht's Concrete Pumping*, 255 P.3d at 1061.

Accordingly, plaintiff's claim for breach of the express terms of the first PMA survives.

### 3. Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff alleges that defendant breached the covenant of good faith and fair dealing implied in the first PMA by "failing to honor Clark's and its other customers' modifications even after such PMAs [had] been signed and notarized," thereby "abus[ing] its authority under its PMAs" and "frustrat[ing] its borrowers' ability to obtain and maintain the benefits of their signed PMAs."  Docket No. 1 at 44, ¶ 146.  Defendant argues that this claim fails because plaintiff alleges that defendant "did not have **any discretion** to not offer a permanent modification if Plaintiff satisfied certain preconditions."  Docket No. 9 at 17 (emphasis in original).

"Colorado, like the majority of jurisdictions, recognizes that every contract contains an implied duty of good faith and fair dealing," *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995), intended to "ensure that a party is not deprived of the fruits of a contract by the arbitrary or unreasonable actions of the other party."  *Salt Lake Tribune Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1104 (10th Cir. 2003).  This duty "applies when one party has discretionary authority to determine certain terms of the contract, such as quantity, price, or time."  *Amoco*, 908 P.2d at 498.

Plaintiff argues that the first PMA gave defendant discretion to determine, before the effective date of the modification, whether plaintiff's representations were true and correct.  Docket No. 12 at 19 (citing Docket No. 1-2 at 22, ¶ 2(B) ("If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that my

representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate.")).

The effective date of the modification was April 1, 2013. Docket No. 1-2 at 22, ¶ 3. Plaintiff alleges that defendant signed the first PMA on April 22, 2013 and recorded it in Jefferson County, Colorado on May 6, 2013. Docket No. 1 at 46, ¶ 156; Docket No. 1-2 at 21, 28. Plaintiff alleges that defendant breached the first PMA on July 19, 2013 by sending her a second PMA with different and less favorable terms than the first PMA. Docket No. 1 at 15, ¶ 50. In addition, plaintiff alleges that defendant breached the first PMA by sending her (1) a letter regarding loss mitigation alternatives on May 28, 2013; (2) a default letter and a Notice of Availability of Homeownership Counseling on June 5, 2013; (3) a notification of default on June 17, 2013; and (4) letters regarding loss mitigation options on June 19, 2013 and July 17, 2013. Docket No. 1 at 16, ¶ 52. In other words, plaintiff alleges that defendant breached the contract after the effective date of the modification–April 1, 2013–had passed. Plaintiff does not argue that the first PMA afforded defendant discretion in carrying out the loan modification after the effective date. *See* Docket No. 12 at 19-20. Moreover, the plain language of the first PMA supports the conclusion that its terms were mandatory and did not allow defendant discretion to "determine certain terms . . ., such as quantity, price, or time" after the passage of the effective modification date. *See Amoco*, 908 P.2d at 498.

In sum, plaintiff's allegations describe a breach of the first PMA's express terms, but not a breach of any implied duty to exercise discretion without depriving plaintiff of

the benefit of her bargain. *See Salt Lake Tribune Publ'g Co.*, 320 F.3d at 1104.

Plaintiff's sixth claim will be dismissed.

### 4. Promissory Estoppel

In Colorado, a promissory estoppel claim has three elements: "(1) a promise

which the promisor should reasonably expect to induce action or forbearance of a

definite and substantial character on the part of the promisee; (2) action or forbearance

induced by that promise; and (3) . . . circumstances such that injustice can be avoided

only by enforcement of the promise." *PayoutOne v. Coral Mortg. Bankers*, 602 F.

Supp. 2d 1219, 1226 (D. Colo. 2009).

Plaintiff alleges that, in reliance on the representations defendant made in the

first PMA, she "continued to make payments rather than perform [an] efficient breach[]

by simply handing [her] keys to Green Tree without further delay." Docket No. 1 at 46,

¶ 157. She alleges that, had she known defendant "was not actually going to fulfill the

terms of the PMA, she would have stopped making the monthly trial payments in order

to mitigate her losses, rather than continue paying on a mortgage that was going to be

foreclosed on anyway." *Id*. She alleges that she was damaged as a result of her

reliance insofar as she was denied the promised loan modification, deprived of the

opportunity to pursue other loss mitigation strategies, reported incorrectly to the credit

bureaus for delinquent payments, and subjected to emotional distress. *Id*. at 40-41, 48,

¶¶ 132, 162.

Defendant argues that plaintiff's promissory estoppel claim should be dismissed insofar as it is based on the first PMA because plaintiff alleges that the first PMA is a signed, enforceable agreement.  Docket No. 9 at 18.

"A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."  Fed. R. Civ. P. 8(d)(2); *see also SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1092 (D. Colo. 2013) ("a party is permitted to pursue a claim for breach of contract and promissory estoppel in the alternative").

Under the Federal Rules of Civil Procedure, Ms. Clark may plead a breach of contract claim and a promissory estoppel claim based on the same conduct or document in the alternative, although she may not ultimately prevail on both claims. *See* Fed. R. Civ. P. 8(d)(2); *SolidFX, LLC*, 935 F. Supp. 2d at 1092; *Wigod*, 673 F.3d at 566 n.8 ("Wigod may preserve her promissory estoppel claim as an alternative in the event the district court or a jury later concludes as a factual matter that an enforceable contract did not exist."); Docket No. 12 at 20-21 ("Plaintiff pled promissory estoppel (Count VII) in the alternative to her breach of contract claims (Count V)[.]").

Thus, plaintiff's promissory estoppel claim survives with respect to the first PMA.

### 5.  *Economic Loss Doctrine*

Defendant argues that plaintiff's claims for fraudulent misrepresentation and violation of the CCPA are barred by the economic loss doctrine.  Docket No. 9 at 18-20.

Under Colorado's economic loss doctrine, intended to maintain the boundaries between contract and tort law, a "breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will

not lie." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1259, 1262 (Colo. 2000). However, where a party cannot bring a claim under contract law, "the economic loss doctrine does not bar them from bringing . . . claims under tort law." *Paquet v. Smith*, 854 F. Supp. 2d 1003, 1011 (D. Colo. 2012) (citing *A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862, 865-66 (Colo. 2005) ("Where there exists a duty of care independent of any contractual obligations, the economic loss rule has no application and does not bar a plaintiff's tort claim[.]")) "The phrase 'economic loss rule' necessarily implies that the analysis focuses on the type of damages suffered by the aggrieved party, and while the relationship between the type of damages suffered and the availability of a tort action is inexact at best, examining the type of damages suffered may assist in determining the source of the duty underlying the action." *Parr v. Triple L & J Corp.*, 107 P.3d 1104, 1108 (Colo. App. 2004).

Plaintiff asserts claims for fraudulent misrepresentation and violation of the CCPA based on (1) defendant's alleged failure to honor the first PMA, Docket No. 1 at 49-50, 59 ¶¶ 169-72, 210; and (2) defendant's statements that it did not have a record of plaintiff's initial HAMP application and that plaintiff would have to begin again the entire HAMP application process if she wished to modify her loan.  Docket No. 1 at 30, 60-61, ¶¶ 96, 217.

A claim for fraudulent misrepresentation has four elements: "a knowing misrepresentation of material fact, reliance on the material misrepresentation, the right or justification in relying on the misrepresentation, and reliance resulting in damages." *Williams v. Boyle*, 72 P.3d 392, 399 (Colo. App. 2003).  To prevail on a claim under the

CCPA, a plaintiff must show: (1) an unfair or deceptive trade practice that (2) occurred in the course of the defendant's business, (3) significantly impacts the public as actual or potential consumers of the defendant's services, and (4) caused the plaintiff injury to a legally protected interest. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146-47 (Colo. 2003).

The economic loss doctrine bars plaintiff's claims insofar as they are based on defendant's failure to adhere to the terms of the first PMA, since the duty to adhere to those terms arises from the PMA and not from an independent, non-contractual source of law. *See Town of Alma*, 10 P.3d at 1262.  However, the duty not to mislead plaintiff about whether Green Tree possessed her financial documents and whether she needed to reapply for a modification from the beginning of the process did not arise from the existence or terms of a contract or other agreement between the parties.  Even if plaintiff never received a TPP or a PMA, it would be improper for Green Tree to mishandle plaintiff's documents, misrepresent its possession of plaintiff's documents, and require plaintiff to needlessly apply multiple times for the same program.

Furthermore, plaintiff alleges that, as a result of defendant's deceptive practices, she suffered damages that cannot be traced to the breach of the first PMA, namely, (1) being forced to re-send application materials at her own expense and (2) being subject to emotional distress "caused by Green Tree dragging out the HAMP process, sending default letters, [and] claiming to have never received documents[.]"  Docket No. 1 at 32-33, ¶¶ 102(b), (e); *see Parr*, 107 P.3d at 1108.  These purported injuries did not arise from defendant's alleged failure to comply with the terms of a particular document, but rather from failing to maintain proper documentation, asking for information from

plaintiff repeatedly, and providing plaintiff with varied and contradictory answers to her questions.

Accordingly, plaintiff's claims for fraudulent misrepresentation and violation of the CCPA are not barred by the economic loss doctrine insofar as they are based on defendant's "false representations that Green Tree did not have HAMP records for Clark . . . and that [she] would have to start the whole process over by re-applying for HAMP."  *See* Docket No. 1 at 59, ¶ 210.  As defendant does not move to dismiss plaintiff's CCPA claim on any other grounds, *see* Docket No. 17 at 12-13, that claim survives.  The Court will proceed to consider defendant's remaining argument regarding plaintiff's claim for fraudulent misrepresentation.

### 6. Fraudulent Misrepresentation

Plaintiff alleges that defendant fraudulently misrepresented that "Green Tree had absolutely no record of her participation in the HAMP, that Green Tree did not have any documentation related to the HAMP, and that Green Tree had no records of Clark having been approved by BAC for a Trial Plan."  Docket No. 1 at 30, ¶ 96.  She further alleges that defendant "falsely informed Plaintiff that the[] only way for her to participate in the HAMP was for her to start the entire loan modification process all over."  *Id*. at 30-31, ¶ 97.  Plaintiff alleges that she justifiably relied on these misrepresentations by completing new HAMP applications and that she was damaged because the second TPP contained materially worse terms than the first TPP.  *Id*. at 31-32, ¶¶ 99-101.

Defendant argues that plaintiff's claim for fraudulent misrepresentation fails because she does not allege that defendant knew that the challenged representations were false when made.  Docket No. 9 at 11.

As noted above, one element of a claim for fraudulent misrepresentation is that defendant made a "knowing misrepresentation of material fact."  *Williams*, 72 P.3d at 399.  A knowing misrepresentation is one made with knowledge that it is false or "with a reckless disregard of and indifference to [its] truth or falsity."  *Hawkinson v. A.H. Robins Co., Inc.*, 595 F. Supp. 1290, 1312 (D. Colo. 1984); *see also Ebrahimi v. E.F. Hutton & Co., Inc.*, 794 P.2d 1015, 1017 (Colo. App. 1989) ("In a fraud case, on the other hand, the gravamen of the tort is the defendant's conscious knowledge of the falsity of the representation or such recklessness as amounts to a conscious indifference to the truth."); Restatement (Second) of Torts § 526, Conditions Under Which Misrepresentation Is Fraudulent (Scienter) (1977), comment d ("The fact that the misrepresentation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false is not enough to impose liability upon the maker for a fraudulent misrepresentation under the rule stated in this Section, but it is evidence from which his lack of honest belief may be inferred.").

Plaintiff alleges that:

By making such false representations–namely that Green Tree did not have HAMP records and that Clark and the other BAC TPP Class members would have to start the whole process over–Green Tree failed to exercise reasonable care or competence in obtaining or communicating information regarding the borrowers' HAMP Trial Plans and the status of such modifications.  Green Tree either failed to adequately obtain the borrowers' loan files or it failed to adequately review and communicate the information contained within such files.  Further, Green Tree failed to exercise reasonable care in determining whether the borrowers had already been

approved for TPPs and falsely communicated that all borrowers, regardless of whether they had been approved for TPPs, had to start the process all over.

Docket No. 1 at 31, ¶ 98.

In this case, plaintiff's allegations do not rise above the level of negligence. Plaintiff alleges that defendant "failed to exercise reasonable care or competence," "failed to adequately obtain the borrowers' loan files," "failed to adequately review and communicate the information contained" in those loan files, and "failed to exercise reasonable care in determining whether the borrowers had already been approved for TPPs." *Id.* These allegations evoke the standard for negligence. *See Ebrahimi*, 794 P.2d at 1017 (discussing the tort of negligent misrepresentation). They do not plausibly allege that defendant acted with reckless disregard or conscious indifference to plaintiff's HAMP status. *See* Restatement (Second) of Torts § 526, comment d.

Thus, plaintiff fails to state a claim for fraudulent misrepresentation.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant Green Tree's Motion to Dismiss Class Action Complaint [Docket No. 9] is GRANTED in part and DENIED in part. Count I survives with respect to plaintiff's claim for violation of 15 U.S.C. § 1692e; it is dismissed in all other respects. Counts II, III, IV, VI, VIII, X, and XII are dismissed. Counts V and VII survive with respect to the first Permanent Modification Agreement; they are dismissed in all other respects. Counts IX and XI survive.

DATED September 24, 2014.

BY THE COURT:


  s/Philip A. Brimmer                                   
PHILIP A. BRIMMER
United States District Judge