**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____13-cv-2646_____

**SHANNON CLARK**, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

**GREEN TREE SERVICING LLC**, a Delaware limited liability company,

      Defendant.

---

**FIRST AMENDED CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

---

**NATURE OF THE ACTION**

1.      Plaintiff Shannon Clark ("Clark" or "Plaintiff") brings this suit on behalf of herself and Classes of similarly situated homeowners across the nation to challenge Defendant Green Tree Servicing LLC's ("Defendant" or "Green Tree") deficient, unfair, and fraudulent loan servicing practices in violation of federal and common law, and its intentional and systematic failure to honor Trial Period Plans ("TPPs") and Permanent Modification Agreements ("PMAs") under the federal Home Affordable Modification Program ("HAMP").

2.      Green Tree operates primarily as a servicer of residential mortgage loans owned by third parties. Operating as a wholly-owned subsidiary of Walter Investment Management Corp. ("Walter"), Green Tree services loans for approximately sixteen (16) third-party clients.

Many of its portfolios are viewed as being "high risk" or having special servicing needs. According to Green Tree, it "specializes in turning at-risk consumer loans into performing assets."

3.      In the wake of the historic collapse of the housing market, major banking institutions (e.g. Bank of America, N.A. ("BAC")) entered into periodic agreements whereby they transferred Mortgage Servicing Rights ("MSRs")—especially for troubled loan portfolios— to third party loan servicers (e.g. Green Tree). Green Tree thus grows its business by acquiring the MSRs for massive loan portfolios owned by third party banks. Indeed, over the past several years BAC has sold Green Tree the MSRs for billions of dollars worth of loan portfolios.

4.      As part of its servicer role, Green Tree agreed to participate in the HAMP—a federal loan modification program designed to help struggling homeowners avoid foreclosure and stay in their homes. Specifically, in or around April 2009, Green Tree signed a contract with the U.S. Department of the Treasury, through its agent, Fannie Mae, agreeing to participate in the HAMP as an approved HAMP servicer.

5.      Unfortunately for homeowners whose mortgage loans are serviced by Green Tree, Green Tree has systematically ignored its obligations under the Federal Debt Collection Practices Act ("FDCPA") and common law and has refused to honor its contractual obligations associated with the HAMP. And for BAC borrowers whose loan servicing rights were transferred to Green Tree in particular, Green Tree has provided deficient Validation Notices in violation of the FDCPA. Further, for those borrowers who were unlucky enough to have been in the middle of a HAMP application or HAMP trial plan when their loan was transferred to Green Tree, Green Tree routinely claimed to have lost (or never received) records related to the borrowers'

participation in HAMP and forces borrowers to begin the HAMP process all over again starting from square one.

6.      Finally, things keep getting worse the longer that Green Tree services the loans. With specific regard to the HAMP, some Green Tree borrowers have obtained TPPs, made all their trial payments under the TPPs, received signed PMAs, and received evidence that such PMAs had been recorded, only to find out that Green Tree has no intention of actually honoring the PMAs. Instead, Green Tree reverts to the borrowers' loan status pre-PMA and uses bullying tactics in an attempt to coerce and churn borrowers into signing new, less-favorable PMAs or face foreclosure of their homes.

7.      Green Tree's failure to provide proper FDCPA notices and its refusal to honor TPPs and PMAs is no accident. As one of the nation's largest loan servicers, Green Tree has knowingly established a system designed to ignore its statutory and common law obligations, wrongfully deprive eligible HAMP borrowers of an opportunity to modify their mortgages, and force borrowers into foreclosure or other less-beneficial loan modification alternatives. At its core, Green Tree's system is a profit-maximizing endeavor in which Green Tree purchases massive quantities of MSRs without any regard for its actual servicing practices. Green Tree's actions are fraudulent, and constitute express and implied breaches of its various contracts.

**JURISDICTION**

8.      Jurisdiction is proper pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). This claim is brought as a putative class action consisting of over 100 class members in which the amount in controversy exceeds the sum or value of $5,000,000, exclusive

of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from the Defendant. Further, none of the exceptions under that subsection apply.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the property securing the loan forming the subject of the Parties' dispute is located in Jefferson County, Colorado, which is in this District. This Court has supplemental subject-matter jurisdiction over any ancillary or pendent state law claims under 28 U.S.C. § 1367.

## PARTIES

10.      Plaintiff Shannon Clark is a natural person and citizen of the State of Colorado. Plaintiff Clark resides on Berry Drive in Littleton, Colorado and her home mortgage is one of the loans at issue in this lawsuit. At all times relevant, Clark was qualified and eligible to participate in the HAMP under all applicable directives and guidelines.

11.      Green Tree Servicing LLC is a Delaware limited liability company with its principal place of business at 345 St. Peter Street, St. Paul, Minnesota 55102. Green Tree is a wholly-owned subsidiary of Walter Investment Management Corp., which has its principal place of business at 3000 Bayport Drive, Tampa, Florida 33607

## FACTUAL BACKGROUND

### The Sale of MSRs to Firms that Specialize in Servicing

12.      An MSR is a list of servicing rights, conditions and responsibilities that are completed by a loan servicer in return for a payment. The holders of MSRs (i.e. servicers) collect fees for managing loans on behalf of investors who own the loans. Servicing involves various

tasks such as sending out bills, performing collection, managing escrow accounts and handling the foreclosure process for defaulting borrowers.

13.     Mortgage loan originators generally have two choices of what to do with the MSR. Originators can hold the MSR and collect interest from the point of origination until the loan is paid off, or they can sell it to another entity in return for cash. Prior to the collapse of the U.S. housing market, servicing release premiums typically yielded 5x or more of the underlying MSR yearly payment.[1] That multiple is believed to have dropped to around 4x shortly after the housing market collapse, and today the expected return is likely between 1x and 2x.[2]

14.     Regardless, large banking institutions (e.g. BAC) are continuing to sell MSRs in an effort to rid themselves of unfavorable assets. One of the driving factors has been changes in regulatory capital, which classify MSRs as riskier assets that require more equity to cover potential losses. Buyers of MSRs have thus included firms, such as Green Tree, that specialize in servicing and aren't necessarily subject to the same oversight as banks.

15.     The sale of MSRs by large banks further stems from the consolidation of the banking industry after the housing market collapse. Large financial institutions merged and formed even larger organizations, such that banks are hitting (or exceeding) their capacity limitations. Accounting standards used for MSRs have further supported the sale of MSRs because they are sensitive to interest rate changes, such that banks have been forced to write down MSRs as interest rates fell. Banks have also had to write down MSRs because so many mortgages have gone into default over the past five years.

---

[1]     L. Sigurd, *The Opportunity in Mortgage Servicing Rights*, Seeking Alpha, (Apr. 24, 2012, 1:59 p. m.), http://seekingalpha.com/article/522501-the-opportunity-in-mortgage-servicing-rights.

[2]     *Id.*

16.     Starting as early as late 2011, reports indicate that BAC began selling MSRs on a quarterly basis to reduce its presence in the mortgage industry.[3] This included, for example, an approximately $35 billion portfolio of MSRs for sale in or around February 2012, along with a $74 billion package of MSRs sold to Fannie Mae during late 2011.[4] Likewise, in or around January 2013, BAC announced that it would sell a $215 billion portfolio of MSRs to Nationstar Mortgage Holding and another $93 billion to Walter (Green Tree's parent).[5]

17.     The problem is, banks (like BAC) have been selling MSRs to servicers (like Green Tree) that lack the resources, ability, oversight, care, purpose, and incentives necessary to adequately service loans in accordance with federal law and common law rights. This includes the failure to comply with federal guidelines regarding notification procedures post-transfer of the servicing rights, serial and pervasive instances of lost documentation, the improper application of payments, and blatant refusals to honor loan modification contracts. Given that a meaningful portion of the MSR portfolios consists of troubled loans, these improper and illegal servicing practices place already struggling homeowners in an even more precarious position and force them further down the path toward foreclosure.

***Congressional Response to National Foreclosure Crisis***

18.     In the midst of the financial crisis, on October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008. On February 17, 2009, Congress amended the

---

[3]     Paul Muolo, *Bank of America Peddling $35 Billion SR Package*, Mortgage Servicing News (Sept. 20, 2013), http://www.nationalmortgagenews.com//dailybriefing/2010_533/boa-35b-msr-package-1028786-1.html?site=default_msn.

[4]     *Id.*

[5]     Jessica Toonkel, *Exclusive: Bank of America to Sell mortgage servicing rights on $100 billion*, Fox Business (Jan. 8, 2013), http://www.foxbusiness.com/news/2013/01/08/exclusive-bank-america-to-sell-mortgage-servicing-rights-on-100-billion/.

statute by passing the American Recovery and Reinvestment Act of 2009 (collectively the "Act"), 12 U.S.C. § 5201 *et seq.* The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C. § 5201.

19.     The Act granted the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program ("TARP"). 12 U.S.C. § 5211. Under TARP, the Secretary was empowered to purchase or make commitments to purchase troubled assets from financial institutions. *Id.* In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3). The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and that uses the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C. § 5219. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures" and imposes parallel mandates to implement plans to maximize assistance to homeowners and minimize foreclosures. 12 U.S.C § 5220.

*Servicer Participation in the HAMP*

20.     On or about February 18, 2009, acting in accordance with their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced HAMP. Under HAMP, the federal government incentivizes participating loan

servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations that result in more affordable monthly payments. Servicers receive $1,000.00 for each HAMP modification.

21.     The industry entities that perform the actual interface with borrowers—including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure—are known as HAMP servicers.

22.     To participate in the HAMP, a servicer must execute a Servicer Participation Agreement ("SPA") with the federal government. In or around April 2009, Green Tree signed an SPA agreeing to participate in the HAMP as an approved HAMP servicer. Green Tree thereafter executed an amended SPA in or around September 2010. (*See* Amended SPA, attached as Exhibit A.)

23.     The SPA and amended SPA executed by Green Tree incorporate all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac, in connection with the duties of Participating Servicers. The SPA and amended SPA mandate that a Participating Servicer "shall perform" the activities described in the HAMP Documentation "for all mortgage loans it services."

24.     The HAMP Documentation requires that Participating Servicers evaluate *all loans* that are delinquent sixty (60) days or greater for HAMP modifications. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if the HAMP is appropriate for the

borrower.

***Trial Payment Plans (TPPs or Trial Plan)***

25.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather a borrower's financial and other relevant information and, if the borrower qualifies, offer the borrower a TPP. The form TPP used by BAC requires borrowers to make timely trial payments in the amount shown at a rate designed to keep the borrower in his or her home and to return any additional documents that may be required by BAC. (*See, e.g.,* Clark's First TPP, attached as Exhibit B.) The Trial Plan used by BAC provides that BAC will extend offers for permanent modification to borrowers who fulfill the documentation and payment requirements. (*Id.*) If a borrower makes all of the trial period payments on time and provides any requested documents, the second stage of the HAMP process is triggered in which Green Tree is required to offer the homeowner a PMA.

26.     The form Trial Plan used by Green Tree similarly requires borrowers to make timely trial payments in the amount shown on the agreement. (*See, e.g.,* Clark's Second TPP, attached as Exhibit C.) This case challenges, in part, Green Tree's refusal to honor TPP's that its borrowers received from BAC prior to the transfer of servicing rights, accept payments under TPPs provided by BAC, and honor BAC's decisions regarding borrowers' qualification to participate in the HAMP. The form trial plans used by BAC and Green Tree departed from the approved HAMP TPP in material ways, including provisions inserted by the servicers arrogating unto themselves the ability to demand additional documentation and other purported rights and privileges. On information and belief, neither BAC nor Green Tree obtained approval, as required, to modify the language of their HAMP documents in this manner.

***Upon Completion of the Trial, the Borrower executes a Permanent Modification Agreement (PMA)***

27.     Once the trial is complete, the servicer is to provide the borrower with a PMA for his or her signature. The servicer may require that the borrower sign two copies and have the copies notarized before returning them to the servicer. Once signed, the servicer signs and notarizes the PMA and records the PMA, causing the loan to be permanently modified. This case challenges, in part, Green Tree's serial failure to honor its PMAs, even after such PMAs have been signed and recorded. Rather than permanently modify the loans of borrowers with signed PMAs, Green Tree has attempted to unilaterally revoke the agreements, placed borrowers in a pre-PMA loan status, and attempted to coerce borrowers into signing new, less-favorable PMAs or face foreclosure of their homes.

28.     Green Tree's conduct is especially egregious because Green Tree refuses to correct known errors, fails to adequately hire and train staff to effectuate loan modifications, routinely loses borrower HAMP applications and related paperwork, willfully ignores documents—including TPPs and signed PMAs—and otherwise routinely disregards the HAMP directives and guidelines. This leads to arbitrary and capricious disregard of HAMP applications and refusals to permanently modify loans that—but for Green Tree's misconduct—would have, could have, and should have been permanently modified.

## FACTS RELATING TO NAMED PLAINTIFF CLARK

29.     Plaintiff Clark lives in her Colorado home with her children and partner. During early to mid-2012, Clark experienced financial difficulty paying her mortgage and, on or about July 31, 2012, she applied for a loan modification through HAMP. As part of the application

process, Clark was required to provide BAC (the servicer on her loan at that time) with a HAMP application and hardship affidavit, along with substantial financial documentation.

30.     On or about August 28, 2012, BAC sent a letter to Clark informing her that "[b]eginning **September 16, 2012**, your new servicer will be Green Tree Servicing LLC." (*See* BAC Servicing Transfer Notice, attached as Exhibit D) (emphasis added.) The letter further stated "[t]he enclosed notice outlines the important dates and contact information you will need for the transition to your new servicer." (*Id.*)

31.     Included with the BAC Servicing Transfer Notice was a Notice of Assignment, Sale, or Transfer of Servicing Rights. (*See id.* at 3.) Paragraph one of this document stated:

> You are hereby notified that the servicing of your mortgage loan, that is, the right to collect payments from you, will be assigned, sold or transferred from **Bank of America, N.A.** to **Green Tree Servicing**, effective **October 01, 2012.**

(*Id.*) (emphasis added in part.) The Notice then goes on to explain that BAC is the Servicer prior to September 16, 2012 and that Green Tree is the Servicer on or after September 16, 2012.

32.     The BAC Servicing Transfer Notice further confirmed that:

> For **customers currently participating in or being considered for a loan modification program**, we will transfer any supporting documentation you may have submitted to us to Green Tree Servicing LLC. You should continue to make your payment to Bank of America, N.A. through September 15, 2012. On or after September 16, 2012, your payment should be made to Green Tree Servicing LLC unless you are provided additional direction . . . If your loan was awaiting a decision regarding qualification for these programs, that decision will now be made by Green Tree Servicing LLC . . . .

(*Id.* at 2) (emphasis in original.)

33.     Shortly after receiving the BAC Servicing Transfer Notice, Clark contacted BAC via the telephone to inquire about the status of her HAMP application and whether any TPP approved by BAC would be honored by Green Tree. During that call, Clark's account manager,

Christina Sherman, assured her that the transfer of servicing would have **no effect** on her modification. Ms. Sherman further confirmed that Green Tree would honor the TPP approved by BAC provided that BAC had approved the TPP prior to the transfer.

34. On or around September 14, 2012 BAC sent Clark a TPP (the "BAC TPP") informing her that:

> **you are approved to enter into a Trial Period Plan under the federal government's Home Affordable Modification Program** . . . To accept this offer, you must make new monthly Trial Period Plan payments in the exact amount shown below in place of your normal monthly mortgage payment.

(*See* Ex. B) (emphasis included.)

35. Under the terms of Clark's BAC TPP, Clark's first trial payment was due November 1, 2012. Clark's First TPP further informed Clark that she could make her trial payments by calling a BAC "1-800 number" to make a payment by phone or via mail, using payment coupons containing a BAC mailing address. (*See id.*)

36. On or about September 21, 2012, upon receipt of the TPP from BAC, Clark called BAC to obtain additional information, but no one could help her because her loan had already been transferred to Green Tree. On that same day, Clark tried to contact Green Tree. However, the automated system said not to call until after October 16, 2012 when her loan would be uploaded into Green Tree's system.

37. On or about September 27, 2012, Green Tree sent Clark an initial written communication notifying her of an account representative supposedly designated for her.

38. On or about October 1, 2012, Green Tree sent Clark a Validation Notice per the FDCPA. This notice reported the amount due as the total outstanding principal balance of

Clark's note plus all past due amounts. The notice did not inform Clark of the actual amount due—i.e. the past due amount.

39.     On or about October 15, 2012, after receiving calls from Green Tree, Clark called Green Tree to inquire about where to make her first trial payment. Clark spoke with Rene, a Green Tree customer service representative, who informed her that Green Tree had no record of Clark's BAC TPP (approved by BAC) or even that she had ever been in the process of modifying her loan.

40.     Clark promptly faxed a copy of her BAC TPP and HAMP Hardship letter to Green Tree. Clark then called Green Tree to confirm receipt of the fax. Green Tree denied ever receiving the documents.

41.     Clark next spoke with a Green Tree representative, DeDe, who said that a new phone application was needed to determine whether Clark was even eligible to apply for a HAMP modification. Clark completed the phone application and was found to be eligible, according to DeDe, to apply for a HAMP modification.

42.     On or about November 6, 2012, after following up multiple times with Green Tree, Clark finally received the HAMP Application Package in the mail. The Application Package stated that she had until November 6, 2012 (that same day) to complete the paperwork and return it to Green Tree. She promptly completed the Application and returned it to Green Tree, along with her financial documents, believing this was needed for Green Tree to honor her BAC TPP. Along with her application, Clark sent her first Trial Payment under the BAC TPP, which Green Tree cashed in or around December 2012.

43.     On or about December 10, 2012, Green Tree informed Clark that she was approved for a HAMP trial plan. Green Tree also sent Clark a new HAMP TPP (Clark's first TPP from Green Tree, or "First GTS TPP"), dated December 5, 2012. (*See* Ex. C.)

44.     Clark's First GTS TPP required that Clark make three monthly trial payments in the amount of $1,381.76. The BAC TPP had required that Clark make three monthly trial payments in the amount of $1,173.05—meaning Green Tree sought to charge $208.71 more per month in Clark's First GTS TPP. There had been no changes to Clark's financial position to justify the $208.71 payment increase or any other changes.

45.     Clark made the three trial payments to Green Tree under Clark's First GTS TPP due by January 1, 2013, February 1, 2013, and March 1, 2013. During that time, Clark continued to receive letters in the mail regarding foreclosure and the sale date of her home.

46.     On or about March 20, 2013, Green Tree sent Clark a Permanent Modification Agreement. (*See* Clark's First PMA, attached as Exhibit E.) The letter attached to Clark's First PMA stated that "[t]o accept this offer, you must sign and return both copies of the Modification Agreement to us in the enclosed, pre-paid envelope by 04/19/2013." (*Id.*) (emphasis included.)

47.     On April 10, 2013, Clark signed the two copies of the PMA before a notary public and promptly sent the copies to Green Tree. On April 22, 2013, Jeff D. Koenig, Director Default Services of Green Tree, signed the PMA before a notary public. On May 6, 2013, Clark's First PMA was recorded in Jefferson County, Colorado. (*See* Ex. E.)

48.     Clark's First PMA required that Clark attest: "I have provided documentation for **all** income that I receive." In conjunction with her signed First PMA, Clark sent Green Tree a letter explaining errors in Green Tree's income calculation contained within the Green Tree TPP

Agreement. (*Id.*) Notably, Clark could readily attest that she had provided Green Tree all income documentation in full compliance with the TPP and PMA—she simply wanted to alert Green Tree that she didn't agree with how Green Tree had calculated her income for the purposes of her First PMA.

49.     On or about April 16, 2013, Clark spoke with Green Tree representative Jerad German who indicated that, according to Green Tree, the income was calculated correctly for her loan modification. On or about June 11, 2013, Green Tree also sent Clark a response letter regarding her income. This letter stated, without actual explanation, that "Your income is calculated at the time of the trial period plan. Based on documents received, the income was calculated correctly." (*See* June 11, 2013 Letter, attached as Exhibit F.)

50.     In or around July 2013 Green Tree apparently performed "investor reporting" with respect to Clark's modification and others. As a result of this "investor reporting", which Green Tree performed *after* it had already executed, delivered to Clark, and recorded Clark's First PMA ("Post-execution investor reporting), Green Tree sent Clark a second PMA for her signature containing materially different terms than her First PMA which had been recorded with Jefferson County since May 6, 2013. (*See* Clark's Second PMA, attached as Exhibit G.) Clark did not receive this second proposed PMA until July 23, 2013.

51.     Below is a chart comparing the terms of Clark's First PMA (the fully executed PMA) that Green Tree sent to Clark in or around March 2013 with the Second PMA that Green Tree sent to Clark in or around July 2013.

|  | First PMA | Second PMA |
|---|---|---|
| Starting Principal Balance | $258,868.43 | $259,991.48 |

| Term | 298 mos / approx. 25 yrs | 480 mos / 40 years |
|---|---|---|
| Interest Rate | 2.00 % | 3.875 % |
| Monthly Principal and Interest Payment | $1,102.90 | $1,061.87 |
| Principal Forgiveness | $1,123.05 | $0.00 |
| **Finance Charges Over Life of Loan** | **$69,796.62** | **$255,039.38** |

52.     Wholly ignoring the fact it had recorded Clark's permanent modification on May 6, 2013, Green Tree, which was "dual-tracking" Clark (proceeding with foreclosure at the same time as it was supposed to be helping her pursue foreclosure alternatives) proceeded to send Clark the following default and foreclosure notices: On or about May 28, 2013, Green Tree sent Clark a letter regarding Home Affordable Foreclosure Alternatives. Likewise, on or about June 5, 2013, Green Tree sent Clark a default letter with a July 5, 2013 cure date as well as a Notice of Availability of Homeownership Counseling. On or about June 17, 2013, Green Tree sent Clark a default notice with notification that her home would be referred to foreclosure. Two days later, on or about June 19, 2013, Green Tree sent Clark a letter regarding loss mitigation options, and then sent another letter regarding loss mitigation options on or about July 17, 2013. (*See* Notifications attached as Group Exhibit H.) On or about July 22, 2013, Clark called Green Tree to ask why she was still receiving foreclosure and loss mitigation notices in the mail and to confirm where she should mail her escrow check for insurance. Green Tree representative DeDe told Clark that something was done incorrectly on her account and that a modification specialist, Susanna, would be in touch soon.

53.     On or about July 26, 2013, Green Tree representative Susanna called Clark and told her that she did not qualify for HAMP Tier I because it "does not allow the interest rate to be at 2.00%," and thus she could not receive the HAMP modification set forth in Clark's First PMA (which, again, had already been signed by both Parties and recorded in Jefferson County back on May 6, 2013). Susanna further stated that the First PMA documents were sent incorrectly to Clark. Susanna claimed Clark didn't have a signed copy of the First PMA from Green Tree, which was (and remains) demonstrably false. She further advised Clark that she had to sign the Second PMA or risked losing her home.

54.     On or about July 26, 2013, Clark also spoke with Janella, another Green Tree representative in the collections department, who provided Clark the terms of the Second PMA (Clark still had not received it in the mail). On July 30, 2013, Clark spoke with another Green Tree representative, MaryLou, who informed Clark that her account was "under investigation."

55.     On or about July 31, 2013, Clark received a call from another Green Tree representative, Jared German, who told her that she didn't meet the income requirements for a HAMP Tier I modification. According to German, he had "just calculated" her income as $4,019.67. He stated that the Debt-to-Income requirements were different for HAMP Tier I than HAMP Tier II. According to German, HAMP Tier 1 only allows a DTI between 10% and 30% and the principal, interest, taxes, and interest (PITI) must be within 30% of the borrower's income. According to German, HAMP Tier II allows the DTI to go to 55%. After extensive back and forth conversation regarding income calculation for Clark's modification, German (who in April 2013 had confirmed that Clark's income was, according to Green Tree at least, calculated

correctly) brazenly threatened Clark that he would personally cancel Clark's participation in the HAMP and put her in foreclosure if she didn't sign the Second PMA.

56.     German's statements regarding Clark's income and her qualification for HAMP Tier I are demonstrably false. In order to qualify for a Tier I modification, the borrower's front-end DTI must be greater than 31% (not between 10% and 30%). The lender then uses the HAMP waterfall steps to reduce the borrower's DTI to as close to 31% as possible. Homeowners who do not satisfy the income qualification requirement for HAMP Tier 1 (i.e. have a DTI less than 31%) or otherwise do not qualify (e.g. because they have a rental, rather than owner occupied, property) may be considered for HAMP Tier II. HAMP Tier II sets the acceptable front-end DTI range to 10% at the low end and 55% at the high end, and servicers have the flexibility to select a DTI range that suits their portfolio.[6] As explained below, Clark met and continues to meet the income requirements for Tier I (i.e. her front-end DTI was greater than 31%) and she should have received a Tier I modification consistent with her Tier I Trial Plan. Notably, her property is also owner-occupied.

57.     Front-end DTI "is the ratio of principal, interest, taxes, insurance (including homeowners' insurance and hazard and flood insurance), and homeowners' association and/or condominium fees (PITIA) to gross monthly income."[7] There are three potential figures for Clark's income (the correct figure determined by Clark and BAC, along with the two incorrect

---

[6]     See HAMP Supplemental Directive 12-2, at 5 (Mar. 9, 2012), available at: https://www.hmpadmin.com//portal/programs/docs/hamp_servicer/sd1202.pdf; see HAMP Supplemental Directive 12-9, at 3-4 (Nov. 30, 2012), available at: https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1209.pdf.

[7]     See HAMP Base Net Present Value (NPV) Model v5.0 Model Documentation, at 9 n.1 (June 1, 2012), available at: https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/npvmodeldocumentationv 50.pdf.

figures determined by Green Tree). Under ALL THREE figures, her front-end DTI satisfies the

31% requirement (i.e. it is greater than 31%). The calculations are as follows (PITI / Income =

DTI):

| | Calculation based on Income reported by BAC (First TPP, Ex. B) | Calculation based on Income reported by Green Tree (Second TPP, Ex. C) | Calculation based on Income reported by Jared German during July 31, 2013 call with Clark |
|---|---|---|---|
| Pre-Modification Interest (Interest-Only Loan) | $1,265.87 | $1,265.87 | $1,265.87 |
| Taxes and Insurance (Escrow Payment, Ex. G) | $274.29 | $274.29 | $274.29 |
| Income | $3,781.83[8] | $4,450.34[9] | $4,019.67 |
| **Front-End DTI** | **40.7%** | **34.6%** | **38.3%** |

Therefore, under ALL possible income scenarios, even under Green Tree's mistaken

calculations, Clark qualified for a Tier I modification and should have received the modification

agreed to in her First PMA.

58.     On or around August 7, 2013, Green Tree sent Clark another copy of the Second

PMA.

59.     During the course of her conversations with Green Tree representatives regarding

the Second PMA, Clark was informed that Green Tree had made 'mistakes' on its end by

sending out the wrong PMAs and that it had happened to 'lots' of other people. It is unclear at

this time the number of such people who supposedly had fully executed and delivered PMAs,

---

[8]     In the letter that Clark wrote to Green Tree on April 9, 2013, she calculated her income as $3,750, or $31.83 less than the figure reported by BAC in the First TPP.

[9]     Green Tree confirmed its belief that this income figure was correct in its June 11, 2013 letter to Clark. (*See* Ex. F.)

like Clark had, whose PMAs Green Tree breached as a result of its Post-execution Investor

Reporting.

60.     Clark thereafter sent Green Tree a Qualified Written Request under RESPA. On

or around September 20, 2013, Green Tree sent Clark a letter in response to her Qualified

Written Request. This letter stated:

> As you are aware, an error was detected on the modification agreement sent on March 20, 2013. A revised modification agreement was provided to you on July 19, 2013 to correct the terms and conditions of the plan. The previous agreement executed by Borrower and Lender are void and of no legal effect. If you elect not to sign the corrected agreement, the terms of your original loan documents shall continue and you will not be eligible for a modification under the HAMP. *Reference Section 4 (Additional Agreements) Paragraph K of the Modification Agreement.*

(*See* September 20, 2013 Letter, attached as Exhibit I.)

61.     Paragraph 4.K of the Modification Agreement requires the borrower to agree:

> That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms of this Plan if an error is detected after execution of this Agreement.

(*See* Ex. E.) Contrary to Green Tree's insistence that Clark must sign the Second PMA or risk

being dropped from the HAMP (and ultimately foreclosed on), Clark had no obligation to sign

the Second PMA because, as explained above, Green Tree **had not** committed an error in

initially determining that Clark was eligible for a Tier I modification because her front-end DTI

was greater than 31%. Therefore, Green Tree had no basis for sending the Second PMA or for

refusing to honor the First PMA. Likewise, and to the extent that Green Tree claims that it was

an error on Green Tree's part to have agreed to a fixed rate of 2% for the life of Clark's

modification (without any "step up" after five years as HAMP allows (but does not require)), on

information and belief no investor contract, pooling and servicing agreement, or other contract

with the investor ("Investor Language") on Clark's loan prohibited or otherwise didn't allow for modifications that were fixed at 2% for the life of the loan. And in any case, Green Tree's reading of Paragraph 4.K for Clark's First PMA would render the agreement illusory, as it would allow Green Tree to—months or years after the PMA was recorded and the borrowers commenced performance—simply revoke the PMA and claim that it had made this or that error (even without any ability to substantiate what the error may have been).

62.     In or around July 2013, Clark reviewed her personal credit report. (*See* Credit Report, attached as Exhibit J.) This report revealed that Green Tree had reported Clark past due prior to April 2013 while Clark was in her trial plan. Green Tree reported Clark as current during the month of April 2013 (when her First PMA was executed). For the months of May 2013, June 2013, and July 2013 Green Tree reported Clark as being more than $13,000 past due on her mortgage, despite the fact she had timely made all payments as required by the First PMA.

63.     The Monthly Billing Statements that Green Tree sent to Clark further show Green Tree was not honoring the executed PMA. (*See* Monthly Billing Statements, attached as Group Exhibit K.) The statement dated May 6, 2013, reported a monthly payment of $1,102.90 under the PMA. In the statements issued June 6, 2013, July 6, 2013, August 6, 2013, and September 6, 2013, however, Green Tree stated that Clark's monthly payment was $1,265.87—the amount of her monthly payment before the First PMA. Green Tree also reported Clark as being more than $15,000 past due beginning June 6, 2013 and continued to report increasing amounts past due for the months of July, August, and September 2013. As of September 2013, Green Tree reported that Clark was $17,722.87 past due. Clark has made all of her monthly payments under the executed PMA.

## CLASS ALLEGATIONS

64.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

This class action is brought by Plaintiff on behalf of nationwide Classes defined as follows:

**Breach of PMA Class**: All Green Tree borrowers in the United States whose loans were subject to the same Investor Language as the language that governed Clark's loan, with whom Green Tree executed the same form PMA as Clark's PMA, and whose PMAs Green Tree refused to honor as a result of any Post-Execution Investor Reporting performed by Green Tree from September 27, 2010 to the present.

**Equal Credit Opportunity Act ("ECOA") Class:** All members of the Breach of PMA Class to whom, from September 27, 2011 to the present, Green Tree failed to provide a written statement of reasons in advance of placing their loans in default, reporting them as past due to credit bureaus, revoking or dishonoring their PMAs, or sending them foreclosure-related documentation.

**Alternative Promissory Estoppel Class:** All Green Tree borrowers who were informed by Green Tree that their loans would be permanently modified if they made their trial payments and otherwise complied with HAMP documents and requirements and who relied on Green Tree's statements by: (1) complying with and satisfying all HAMP requirements and documents, (2) foregoing the exploration of other options to save homes, and (3) making their trial payments instead of performing efficient breaches, but whose loans Green Tree refused to modify in accordance with the borrower's program documents as a result of any Post-Execution Investor Reporting performed by Green Tree from September 27, 2010 to the present.

**Fair Debt Collection Practices Act ("FDCPA") Class:** All Green Tree borrowers to whom Green Tree sent a Validation Notice from September 27, 2012 to the present that contained the total payoff amount for the loan but whose loans had not been accelerated as of the date Green Tree sent the Validation Notice.

**Colorado Consumer Protection Act ("CCPA") Class:** All Green Tree borrowers in Colorado who, from September 27, 2010 to the present, Green Tree falsely informed that Green Tree no longer possessed the borrowers' HAMP documents and that the borrower would need to re-send previously sent paperwork who re-sent new HAMP materials to Green Tree.

Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; and (4) the legal representatives, successors or assigns of any such excluded persons. Plaintiff anticipates that amending the Class Definitions may become necessary following additional discovery.

65.     Plaintiff sues on her own behalf and on behalf of the above-defined Classes under Rule 23(a) and (b) of the Federal Rules of Civil Procedure.

66.     Plaintiff does not know the exact size or identities of the members of the proposed Classes, since such information is in the exclusive control of Defendant.

67.     Plaintiff believes that the Classes encompass hundreds, if not thousands, of individuals whose identities can be readily determined from Defendant's books and records.

69.     With regard to the PMA Class, a Green Tree representative informed Clark that Green Tree was running 90 - 120 days behind, that they had sent the wrong PMAs to "lots" of other people, and that such other people were being required to sign new PMAs with different terms. Green Tree is required to enter dates electronically on each borrower's file for when specific file activity is completed and internal reports, among other documents, will thus reveal class member identifies. Therefore, proposed Class membership is ascertainable based upon objective criteria and is so numerous that joinder of all members is impracticable.

70.     Based on the size of the modifications, amount of statutory damages, and number of class members at issue, Plaintiff believes the amount in controversy readily exceeds $5

million. All members of the respective Classes have been subject to and affected by the same conduct. The claims are based on form notices, form contracts, and uniform loan modification processing requirements, including Green Tree's failure to send proper account verification notices under the FCRA and its serial failure to cause loans to be permanently modified per the terms of the PMAs. There are questions of law and fact that are common to the respective Class members that will generate common answers and that are subject to common proof, and predominate over any questions affecting only individual members of the Classes. These questions include, but are not limited to the following:

a. Whether Green Tree's signed PMAs with its customers obligated it to permanently modify those customers' loans;

b. Whether Green Tree breached express terms of its signed PMA with Clark and its other customers by unilaterally revoking their PMAs as a result of its Post-Execution Investor Reporting;

c. Whether, for persons in the Breach of PMA Class, Green Tree provided them with a written statement of reasons in advance of placing their loans in default, reporting them as past due to credit bureaus, revoking or dishonoring their PMAs, or sending them foreclosure-related documentation so as to comply with the ECOA;

d. Whether, insofar as no contracts were breached, Green Tree falsely promised Clark and the other Class Members that it would permanently modify their loans and whether Clark and the Class Members reasonably relied on Green Tree's promises;

e. Whether Green Tree's form Validation Notices satisfied its obligations under the FDCPA;

f. Whether Green Tree falsely informed borrowers that it had lost their documents;

g. Whether Clark and the other Class Members have suffered damages; and

h. Whether Green Tree's conduct with respect to Clark and the other Class Members can be enjoined as to all of them such that injunctive relief and

corresponding declaratory relief are appropriate.

71.     Plaintiff's claims are typical of the claims of the Classes and do not conflict with the interests of any other members of the Classes in that both the Plaintiff and the other members of the Classes were subject to the same conduct, received (or failed to receive) the same notices, relied on and were subject to the same Investor Language and forms PMAs, and/or were met with the same revocation of their modifications.

72.     Plaintiff will fairly and adequately represent the interests of the Classes, is committed to the vigorous prosecution of the claims, and has retained attorneys who are qualified to pursue this litigation and have experience in class actions and HAMP litigation specifically.

73.     This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

74.     The Defendant has acted or refused to act on grounds that apply generally to the Classes so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Classes as a whole.

75.     Common issues predominate and are central to the litigation over any perceived individual issues. A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

**COUNT I**
**Violation of the FDCPA § 809 [16 U.S.C. 1692g] (Validation of Debts)**
**(On behalf of Plaintiff Individually and the FDCPA Class)**

76.     Plaintiff re-alleges and incorporates the above allegations as if set forth fully

herein.

77.     Plaintiff brings this claim on her own behalf and on behalf of each member of the FDCPA Class described above.

78.     Plaintiff is a "consumer" within the meaning of FDCPA § 803(3) because she is a natural person who is obligated to pay a debt. Clark's loan was in default when Green Tree acquired the MSRs for her loan.

79.     Defendant is a "debt collector" within the meaning of the FDCPA § 804(6) because Green Tree's principal business is the collection of debts. Green Tree operates primarily as a servicer of high risk loans, rather than as a creditor who offers of extends credit to borrowers. *See Castro v. Green Tree Servicing LLC*, No. 10-CV-7211 ER, 2013 WL 4105196 (S.D.N.Y. Aug. 14, 2013) (citing Declaration of Brian L. Bromberg wherein defendant "admit[s] that Green Tree is a 'debt collector' as defined by 15 U.S.C. § 1692a(6)").

80.     The FDCPA requires that "[w]ithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall . . . send the consumer a written notice containing:

(1) the amount of the debt;

(2) the name of the creditor to whom the debt is owed;

(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;

(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and

(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor."

*See* FDCPA § 809(a). This notice is commonly referred to as a "Validation Notice."

81.     Under FDCPA § 809(a)(1), "amount of the debt" "refers to amount past due currently sought by debt collector, not consumer's overall balance with creditor." *Barnes v. Advanced Call Ctr. Technologies, LLC*, 493 F.3d 838 (7th Cir. 2007); *see also Huckfeldt v. BAC Home Loans Servicing, LP*, No. 10-CV-01072-MSK-CBS, 2011 WL 4502036 (D. Colo. Sept. 29, 2011) ("The statute requires . . . an identification of the original creditor, the current creditor claiming to own the debt, and the amount of the debt in arrears.").

82.     On or about September 27, 2012, Green Tree sent Clark an initial written communication notifying her of her account representative. (*See* Sept. 27, 2012 Letter, attached as Exhibit L.) This communication did not notify Clark regarding the amount of her debt, or any of the additional information required by FDCPA § 809(a).

83.     On or about September 28, 2012, Green Tree sent two additional written communications to Clark, neither of which contained information required by FDCPA § 809(a).

84.     On or about October 1, 2012, Green Tree sent Clark a written Validation Notice, which stated:

> AS OF SEPTEMBER 15, 2012, **YOU OWE $235,090.90**. BECAUSE OF INTEREST, LATE CHARGES, AND OTHER CHARGES THAT MAY VARY FROM DAY TO DAY, THE AMOUNT DUE ON THE DAY YOU PAY MAY BE GREATER. HENCE, IF YOU PAY THE AMOUNT SHOWN ABOVE, AN ADJUSTMENT MAY BE NECESSARY AFTER WE RECEIVE YOUR CHECK, IN WHICH EVENT WE WILL INFORM YOU BEFORE DEPOSITING THE CHECK FOR COLLECTION. FOR FURTHER INFORMATION CONTACT CUSTOMER SERVICE AT THE ADDRESS OR TOLL-FREE NUMBER LISTED ABOVE.

(*See* Validation Notice, attached as Exhibit M) (emphasis added). The Validation Notice was a form document which, on information and belief, was sent in substantially the same form to all other borrowers where the MSRs for their loans were transferred from BAC to Green Tree.

85.     The $235,090.90 value reported in the October 1, 2012 Validation Notice reflected the putative total outstanding principal balance for Clark's loan plus past due amounts. Contrary to the requirements of FDCPA § 809(a), the Validation Notice did **not** report the amount past due that was currently sought by Green Tree, which at that time was approximately $7,590 as evidenced by Clark's Credit Report. (*See id.*)

86.     By failing to include the past due amount in the Validation Notice, Green Tree deprived Clark and the FDCPA Class of the opportunity to dispute the amounts owed during the 30-day period provided by FDCPA § 809(a)(3), including the lost opportunity to obtain a copy of the verification of the debt or copy of the judgment.

***False or Misleading Representations In Violation of FDCPA § 807(2)(a)(A).***

87.     By sending the Validation Notice dated October 1, 2012, and misrepresenting the status of the debt as accelerated and the total outstanding balance as due and owing, Green Tree falsely represented the character, amount, and legal status of Clark's debt in violation of FDCPA § 807(a)(2)(A).

88.     At no time before demanding $253,090.90 in the Validation Notice dated October 1, 2012 did Green Tree accelerate Plaintiff's mortgage. In fact, it wasn't until on or around October 31, 2012 that Green Tree sent a foreclosure notice to Clark.

89.     As one of the nation's largest loan servicing organizations, Green Tree was or should have been on notice of its requirements under the FDCPA. Therefore, Green Tree either

intentionally or negligently sent improper Validation Notices containing the entire outstanding

balance, rather than the past due amounts. *See Castro*, 2013 WL 4105196 (granting plaintiffs

summary judgment on their claims against Green Tree under FDCPA §§ 809(a) and § 807(e)

where Green Tree sent a Validation Notice that included the total balance, rather than the past

due amount of plaintiffs' loan where the loan had not yet been accelerated by Green Tree).

90.     Plaintiff, on behalf of herself and the putative FDCPA Class members, seeks
declaratory judgment that Green Tree's actions violation the FDCPA, the maximum statutory
damages provided under FDCPA § 813(a) [15 U.S.C. § 1692k], actual damages, plus costs and
attorneys fees. **COUNT II**
**Breach of Contract**
**(On behalf of Plaintiff Individually and the Breach of PMA Class)**

91.     Plaintiff re-alleges and incorporates the above allegations as if set forth fully

herein.

92.     Plaintiff brings this claim on her own behalf and on behalf of each member of the

Breach of PMA Class described above.

***Breach of promise to permanently modify loans***

93.     Green Tree's signed PMA with Clark specifically stated that, "If my

representations in Section 1 continue to be true in all material respects, then this Home

Affordable Modification Agreement ("Agreement") will, as set forth in Section 3, amend and

supplement (1) the Mortgage on the Property, and (2) the Note secured by the mortgage." (*See*

Preamble to PMA, Ex. E.)

94.     Green Tree's signed PMA with Clark further stated that, "If my representations in

Section 1 continue to be true in all material respects and all preconditions to the modification set

forth in Section 2 have been met, the Loan Documents will automatically become modified on

April 1, 2013 (the "Modification Effective Date") and all unpaid late charges that remain unpaid

will be waived. The Loan Documents will be modified and the first modified payment will be due on April 1, 2013." (*See* PMA ¶ 3, Ex. E.)

95.     Green Tree materially breached both of these provisions by failing to permanently modify Clark's and the other Class Members' loans and by instead sending them new PMAs for their signature and threatening them with foreclosure or wrongfully dispossessing them of their homes if they refused to sign the new, less favorable PMA. Specific to Clark, Green Tree sent a new PMA and falsely claimed that Clark's First PMA contained an error that Green Tree discovered during its Post-Execution Investor Reporting.

96.     As explained above Clark qualified for a Tier I trial plan and permanent modification under ALL possible income scenarios and therefore Green Tree had no basis for refusing to honor her First TPP. First, Clark qualified under the income figure used by BAC when it provided her the First TPP because her front-end DTI was greater than 31%. (*See* Ex. B.) Next, she continued to qualify under the second income figure used by Green Tree when they provided her the Second TPP (and later confirmed via letter dated June 11, 2013) because her DTI was over 31%. (*See* Ex. C.) Clark even qualified under the verbal income figure provided to her by Green Tree representative Jared German when they spoke on July 31, 2013. Therefore, Green Tree had no basis for claiming it had committed an "error" in sending out, executing, and recording the First TPP and likewise no basis for refusing to honor the First TPP.

97.     Green Tree has since asserted that it made a mistake, caused by a computer glitch, that resulted in Clark's modification being fixed at a rate of 2% for the life of the modification, whereas Green Tree supposedly did not agree to fixed rates below 3.875%. On information and belief, Green Tree cannot show any Investor Language prohibiting it from agreeing to a 2% fixed

rate for the life of Clark's modification. Rather, Green Tree appears to simply have an arbitrary policy of not agreeing to such modifications. Green Tree claims it discovered this "error" when it was performing Post-Execution Investor Reporting. This is seriously problematic, as Green Tree cannot—after becoming contractually bound to modify someone's loan by executing, delivering, and recording their modification—decide to re-review the loan for investor purposes. Any such investor reporting should be completed prior to Green Tree's executing, delivering, and recording the borrower's modification, not afterwards. Further, Green Tree's invocation of Paragraph 4.K in Clark's form First PMA as grounds for requiring Clark to agree to a "corrected" modification would render the PMA illusory and allow Green Tree months, or even years, after it had already executed, delivered, and recorded a borrower's modification to essentially re-write its key pricing and other terms.

98.     Green Tree has also reported Clark as more than $11,000 in default to the credit bureaus, sent foreclosure notices and loss-mitigation letters after having recorded the PMA, and provided monthly loan statements that do not reflect the terms of her PMA or show that past-due amounts have been capitalized. Specifically, Green Tree sent Clark a letter regarding Home Affordable Foreclosure Alternatives on or about May 28, 2013, a default letter with a July 5, 2013 cure date on or about June 5, 2013, a Notice of Availability of Homeownership Counseling on or about June 5, 2013, a default notice with notification that her home would be referred to foreclosure on or about June 17, 2013, a letter regarding loss mitigation options on or about June 19, 2013, and a letter regarding loss mitigation options on or about July 17, 2013. (*See* Group Ex. H.) Green Tree also sent Clark Monthly Billing Statements dated June 6, 2013, July 6, 2013, August 6, 2013, and September 6, 2013, which reported her more than thousands of dollars past

de and her monthly payment as $1,265.87—the amount of her monthly payment before the TPP. (*See* Group Ex. K.) Notably, Clark has continued to perform under the PMA by making each and every one of her monthly payments under the PMA. Clark sent Green Tree Qualified Written Requests under RESPA on April 9, 2013 (*See* Exhibit N) and again on August 8, 2013 (*See* Exhibit O) but was unable to resolve her issues with Green Tree.

99.     As a result of these breaches, Clark and the members of the PMA Class have suffered damages to be proven at trial, including but not limited to being:

a.     Denied the value of the offer for permanent modification they should've received in the form of lower interest rates, shorter loan terms, and greater principal forgiveness (in Clark's case, $1,123.05 in principal forgiveness plus $185,242.76 in excess finance charges over the life of the loan if she agrees to sign the new, less favorable PMA, or in the alternative, the value of lesser payments compared with the payments under her loan agreement plus principal forgiveness),

b.     Denied the opportunity to collect Pay-for-Performance Success payments from the government,

c.     Denied the opportunity to obtain a modification of their second lien mortgage through the 2MP (the HAMP program that allows for modification of second liens),

d.     Denied the opportunity to collect Pay-for-Performance Success payments from the government under the 2MP,

e.     Denied the opportunity to have their unpaid late fees waived (*see* PMA, Section 3),

f.     Charged late fees before and during the trial period, and after the Modification Effective Date, and having their monthly payments improperly used to service those fees,

g.     Charged appraisal fees, fees for "broker price opinions", and other valuation and administrative fees during the modification process, and having their monthly trial payments improperly used to service those fees,

h.     Reported improperly as having a series of delinquent payments to the credit bureaus once their modifications were improperly denied or revoked and other

damage to credit scores and ratings, including increasing the total cost of credit,

    i.    Deprived of the opportunity to refinance their homes, or seek other means to mitigate losses, and

    j.    Subject to emotional distress caused by Green Tree dragging out the HAMP process, sending default letters, claiming to have never received documents, providing false justifications for denying permanent modifications, and threatening or instituting foreclosure proceedings even though the borrowers had satisfied their PMAs and were owed permanent modifications.

100.    To the extent damages present an inadequate remedy at law, and where possible, Clark and the PMA Class Members are entitled to specific performance under their First PMAs requiring Green Tree to unwind foreclosures, restore them to possession along with their promised permanent loan modifications, with Green Tree incurring all costs, fees, and other charges to carry out such performance.

**COUNT III**
**Promissory Estoppel**
**(On behalf of Plaintiff Individually and the Breach of PMA Class)**
**(plead in the alternative to Count II)**

101.    Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

102.    Plaintiff brings this claim on her own behalf and on behalf of each member of the PMA Class described above.

103.    Green Tree promised its HAMP borrowers that, if they complied with and satisfied the terms set forth in the Program Documents, their mortgages would be permanently modified.

104.    In reliance on Green Tree's promise, Clark and the other PMA Class members complied with and satisfied the terms of the Program Documents and refrained from exploring

other options to reduce their monthly payments, save their homes, and/or mitigate their losses. Specifically, with regard to Clark, she refrained from exploring options to refinance her home with a co-signer, transfer her home to a family member, file for bankruptcy, sell her home, and/or engage in a short sale to potentially recoup any equity that she has in the home.

105.     In the TPP, Green Tree further promised that it would modify Clark's and the other PMA Class members' loans if they timely made all the trial payments and submitted all of the required documentations. (*See* Ex. C.) The TPP also promised that, "[i]f your loan is modified, we will waive all unpaid late charges" and that "[a]ny difference between the amount of the trial period payments and your regular mortgage payments will be added to the balance of your loan along with any other past due amounts."

106.     In reliance on these promises, Clark and the other PMA Class members made all their trial payments and signed and returned copies of the PMA. Clark and the Class also refrained taking other measures to save their home, such as refinance, bankruptcy and other foreclosure alternatives. Specific to Clark, she refrained from exploring options to refinance her home with a co-signer, transfer her home to a family member, file for bankruptcy, sell her home, and/or engage in a short sale to potentially recoup any equity that she has in the home.

107.     On or about April 22, 2013, Jeff D. Koenig of Green Tree signed Clark's PMA. On or about May 6, 2013, the PMA was recorded in Jefferson County, Colorado. In the written PMAs, Green Tree expressly promised Clark and the other PMA Class members that if their representations continued to be true and correct, as determined by Green Tree prior to the Modification Effective Date, "the Loan Documents will automatically become modified on 04/01/2013 (the "Modification Effective Date") and all unpaid late charges that remain unpaid

will be waived" and that the principal balance of their mortgages would be modified to "include all amounts and arrearages that will be past due as of the Modification Effective Date." (*See* Ex. E.)

108.    In reliance on these promises, Clark and the other PMA Class members continued to make payments rather than perform efficient breaches by simply handing their keys to Green Tree without further delay. Specific to Clark, by March of 2013 Green Tree reported her as more than $11,000 in default on her mortgage and she could not have brought her loan current. Had Clark known Green Tree was not actually going to fulfill the terms of the PMA, she would have stopped making the monthly trial payments in order to mitigate her losses, rather than continue paying on a mortgage that was going to be foreclosed on anyway. "The concept of 'efficient breach' is built into our system of contracts." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) (citing *Lockerby v. Sierra,* 535 F.3d 1038, 1042 (9th Cir. 2008).); *Ortiz v. Lyon Mgmt. Grp., Inc.*, 157 Cal. App. 4th 604, 619, 69 Cal. Rptr. 3d 66, 75 (2007) (citing Posner, Economic Analysis of Law (2007) 119–120, 270–273 and Shiffrin, *The Divergence of Contract and Promise* (2007) 120 Harv. L.Rev. 708, 730–733); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547 (7th Cir. 2012) (discussing efficient breach in context of botched HAMP modifications). Clark was misled into making trial payments instead of performing such a breach.

109.    Further, even if Clark were to sign the Second PMA, she has no means of knowing whether Green Tree will in fact honor this Second PMA, or whether Green Tree will once again seek to unilaterally revoke the PMA and place Clark in foreclosure, as Green Tree has already threatened to do.

110.    After Clark signed the First PMA and sent it to Green Tree, Green Tree promised her over the telephone that her income had been calculated correctly and that she qualified to receive the permanent modification. Green Tree then executed the document and had the agreement recorded in the county of Clark's residence. In reliance on these promises, Clark continued to make her monthly payments in accordance with the terms outlined in the PMA, rather than perform an efficient breach by no longer making her payments.

111.    Clark and the other PMA Class members reasonably relied on the promises made by Green Tree in their TPPs, PMAs, and additional correspondence with Green Tree by making their required payments, and keeping their representations true and correct through their Modification Effective Dates. As explained above, had Clark and the PMA Class members known that Green Tree would subsequently refuse to permanently modify their loans or seek to unilaterally revoke their recorded PMAs, they would've engaged in other efforts to save their homes, performed "efficient breaches," declared bankruptcy, sought out opportunities to refinance their loans, or taken other alternatives to save their homes from foreclosure.

112.    Notwithstanding Clark's and the PMA Class members' reliance, Green Tree failed to honor its promise to permanently modify Clark's and the PMA Class members' loans in accordance with the terms of the fully-executed PMAs. Instead, Green Tree wrongfully threatened to terminate all participation in HAMP and foreclose on them if they wouldn't sign the second, less favorable PMA.

113.    As a result of Green Tree's conduct, Clark and the PMA Class members suffered damages as set forth in Paragraph 99 above.

114.    Plaintiff, on behalf of herself and the Breach of PMA Class members, and in the

alternative to Count II above, seeks actual and compensatory damages in an amount to be determined at trial, specific performance of Green Tree's obligations, together with other relief required by equity and law.

## COUNT IV
### Violation of the Equal Credit Opportunity Act (ECOA)
### 15 U.S.C. § 1691
### (On behalf of Plaintiff Individually and the ECOA Class)

115.    Plaintiff re-alleges and incorporates the above allegations as if set forth fully herein.

116.    Plaintiff brings this claim on her own behalf and on behalf of each member of the PMA described above.

117.    Plaintiff Clark and the putative Breach of PMA Class members are "applicants" as defined by the Equal Credit Opportunity Act ("ECOA") because they applied for modification of their home loan mortgages under the HAMP. *See* 15 U.S.C. § 1691a. Clark was current on her loan as of April 2013, after which Green Tree took adverse action against her.

118.    Defendant is a "creditor" as defined by the ECOA because it regularly considers borrowers for loan modifications under the HAMP. *See* 15 U.S.C. § 1691a.

119.    The ECOA requires creditors to furnish written notice of the specific reasons for adverse action taken against a credit applicant. Specifically, the statute provides:

> Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by:
>
> (a) providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or
>
> (b) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a

request made within sixty days after such notification, and (ii) the identity of a person or office from which such statements may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. § 1691(d)(2). A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken. 15 U.S.C. § 1691(d)(3).

120.    Under the ECOA, "adverse action" means

a denial or **revocation of credit**, **a change in the terms of an existing credit arrangement**, or a refusal to grant credit in substantially the amount or on substantially the terms requested. Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

15 U.S.C. § 1691(d)(6).

121.    During April 2013 (the same month when Green Tree signed her PMA before a notary), Clark was reported as being current to the credit bureau, indicating that her loan had in fact been effectuated. (*See* Ex. H.) Under the terms of the First PMA, Clark's past due balances would be capitalized and thus she would no longer have a past due balance. (*See* Ex. E at 2.)

122.    Shortly thereafter, beginning in or around May 2013, Green Tree took adverse action against Clark by putting her back in default and once again reporting her late to the credit bureaus. Green Tree also began sending Monthly Billing Statements that showed Clark was more than $15,000 in default and owed a monthly payment consistent with her pre-modification payment. Beginning in or around July 2013, Green Tree continued its adverse action by notifying Clark that they were revoking the PMA and sending her a new PMA for her signature (the Second PMA). When Clark said that she would not sign the Second PMA, Green Tree threatened her with foreclosure.

123.     Green Tree's conduct of reporting her as being in default even though the First PMA had been recorded and of effectively revoking the terms of the First PMA constitute a revocation of credit or change in the terms of an existing credit arrangement within the meaning of the ECOA.

124.     Green Tree's failure to capitalize Clark's delinquent payments during the May 2013 through August 2013 time period, as promised in the First PMA, also constitutes an adverse action within the meaning of the ECOA. Capitalization of the delinquent payments, as promised in the loan modification agreement, was a form of credit, i.e. the right to defer payment of a debt. The bank's failure to carry through on its promise to capitalize the delinquent payments amounted to a denial or revocation of credit within the meaning of the ECOA.

125.     Clark had the right to avoid foreclosure as long as she complied with the First PMA. Green Tree's threat to place Clark's loan in foreclosure constituted an adverse change in an existing credit arrangement within the meaning of the ECOA.

126.     Clark provided Green Tree ample opportunity to correct its error and honor the terms of her First PMA, yet Green Tree knowingly and intentionally refuses to do so. On multiple occasions Clark informed Green Tree that she had received and signed the First PMA and that Green Tree had both signed and recorded a copy of the agreement. Regardless, Green Tree refuses to honor the First PMA and instead threatened Clark with foreclosure in order to coerce her into signing the Second PMA.

127.     As a result of Green Tree's unlawful practices, Plaintiff and the Class have suffered loss of money and property.

128.     Plaintiff, on behalf of herself and the putative PMA Class members, seeks

declaratory judgment that Green Tree's actions violation the ECOA, injunctive relief, actual

damages in an amount to be proven at trial, the maximum punitive damages provided under

ECOA § 1691e, plus costs and attorneys fees.

**COUNT V**
**Violation of the Colorado Consumer Protection Act (CCPA), C.R.S.A. § 6 – 1 – 101 *et seq.***
**(On behalf of Plaintiff Individually and the CCPA Class)**

129.     Plaintiff re-alleges and incorporates the above allegations as if set forth fully

herein.

130.     Plaintiff brings this claim on her own behalf and on behalf of each member of the

CCPA Class described above.

131.     Green Tree engaged in unfair and/or deceptive trade practices when it made false

representations that Green Tree did not have HAMP records for Clark and the other Class

members and that such Class members would have to start the whole process over by re-applying

for HAMP—and when Green Tree did in fact force its borrowers to re-apply for the HAMP even

though BAC or it had already determined that the borrowers qualified to participate in the

HAMP and provided such borrowers with TPPs and PMAs. Further, where Green Tree actually

approved the Class members for new TPPs or PMAs, such TPPs and PMAs contained worse

terms than previously offered TPPs and PMAs—in Clark's case, monthly payments under the

Green Tree TPP were more than $200 higher than the BAC TPP.

132.     Green Tree operates as a loan servicer. Green Tree therefore performed the unfair

and/or deceptive acts as part of its business, which includes servicing of the Class members'

loans.

133.     Green Tree's unfair and/or deceptive acts significantly impact the public as actual

borrowers whose loans are serviced by Green Tree. On information and belief, Green Tree's practices impact hundreds of thousands of people across the country and discovery will reveal that hundreds, if not thousands, of such persons reside within Colorado.

134.   The vast majority of consumers impacted by Green Tree's practices have relatively little sophistication and no bargaining borrower compared with Green Tree. Only Green Tree had knowledge regarding its internal practices and procedures, only Green Tree had knowledge regarding what records it maintains regarding the TPPs that borrowers received from BAC, and only Green Tree was in a position to honor or refuse to honor such TPPs.

135.   Green Tree's unfair and/or deceptive practices have caused Plaintiff and the CCPA Class to suffer injury including without limitation being:

a.   Denied the value of the PMA Agreement they should've received in the form of lower monthly trial payments (in Clark's case, an approximate $208.71 monthly savings for the three required monthly trial payments),

b.   Forced to re-send the bank HAMP applications and documents including large packets of information, either via fax or mail, at the borrowers' expense, in response to Green Tree's claim that it never received the documents from BAC,

c.   Charged late fees before and during the trial period and having their monthly payments improperly used to service those fees,

d.   Subject to or threatened with foreclosure, and

e.   Subject to emotional distress caused by Green Tree dragging out the HAMP process, sending default letters, claiming to have never received documents, and instituting foreclosure proceedings even though the borrowers received signed PMAs from Green Tree that were recorded.

136.   Plaintiff, on behalf of herself and the CCPA Class members, seeks actual, compensatory, and punitive damages for Defendant's fraudulent misrepresentations, as well as interest, and attorneys' fees and costs in the amount to be determined at trial. Plaintiff seeks

actual damages, reasonable cost and attorneys' fees, an injunction against further violations, and a declaration that Green Tree's conduct is unlawful and unfair to consumers and competition.

## PRAYER FOR RELIEF

**WHEREFORE,** in light of the foregoing, Plaintiff Class, on behalf of herself and a Class of all others similarly situated, respectfully prays that the Court enter an Order:

a.      Certifying this action as a Class Action, appointing Clark as Class Representative and her Counsel as Class Counsel;

b.      Entering judgment against Green Tree and in favor of Clark and the Classes for actual, compensatory, and statutory damages as described herein on Counts I - V in amounts to be proven at trial;

c.      Where damages present an inadequate remedy at law on any Count, entering judgment against Green Tree and in favor of Clark and the Class Members for specific performance requiring that Green Tree permanently modify their loans as promised, terminate any foreclosure proceedings, unwind any foreclosure sales, and restore them to possession of their wrongfully foreclosed homes covering all attendant fees and costs;

d.      Awarding punitive damages against Green Tree;

e.      Awarding damages for emotional pain, suffering and other actual, non-economic damages caused by Green Tree's wrongful, deceptive and unfair servicing practices;

f.      Enjoining Green Tree's continuous breaches of its PMAs and violations of HAMP directives on all claims where available;

g.      Awarding Plaintiff reasonable attorneys' fees and costs; and

h.      Awarding such additional relief as the Court deems necessary and just.

Dated: January 8, 2015                    Respectfully submitted,


                                           /s/ Steven L. Woodrow
                                          One of Plaintiff's Attorneys

STEVEN L. WOODROW #43140
swoodrow@woodrowpeluso.com
PATRICK H. PELUSO #47642
Woodrow & Peluso, LLC
3900 East Mexico Ave., #300
Denver, Colorado 80210
Telephone: 720.213.0675

*Attorneys for Plaintiff and the Putative Classes*